S069919 and S069920 argued and submitted January 18, S069924 submitted on the briefs January 18; final order of Energy Facility Siting Council affirmed March 9, 2023

In the Matter of the Application for Site Certificate
for the Boardman to Hemingway Transmission Line.

### STOP B2H COALITION,
*Petitioner,*

*v.*

### OREGON DEPARTMENT OF ENERGY,
Oregon Energy Facility Siting Council,
and Idaho Power Company,
*Respondents.*

(SC S069919)

In the Matter of the Application for Site Certificate
for the Boardman to Hemingway Transmission Line.

### Michael McALLISTER,
*Petitioner,*

*v.*

### OREGON DEPARTMENT OF ENERGY,
Oregon Energy Facility Siting Council,
and Idaho Power Company,
*Respondents.*

(SC S069920)

In the Matter of the Application for Site Certificate
for the Boardman to Hemingway Transmission Line.

### Irene GILBERT,
*Petitioner,*

*v.*

### OREGON DEPARTMENT OF ENERGY,
Oregon Energy Facility Siting Council,
and Idaho Power Company,
*Respondents.*

(SC S069924)

525 P3d 864

Petitioners sought review of an order of the Energy Facility Siting Council (EFSC) approving an Idaho Power Company (Idaho Power) application for a site certificate to construct a high-voltage electrical transmission line. Following a multi-year process that included a public comment period and a contested case proceeding on the site certificate application, EFSC members voted unanimously to approve Idaho Power's application; EFSC then issued a final order detailing its findings and conclusions. Pursuant to ORS 469.403(3), petitioners filed timely petitions for judicial review of EFSC's order, raising several assignments of error. *Held*: (1) EFSC did not err in giving petitioners only limited party status rather than full party status; (2) EFSC had authority to grant an exception to the noise standards under OAR 340-035-0035, as well as a variance under OAR 340-035-0100 and ORS 467.060, and substantial evidence supported EFSC's granting of an exception and a variance; (3) the Oregon Department of Energy's modification of one requirement of former OAR 345-021-0010(1)(x)(E) (Jan 1, 2019) was authorized by that rule and did not involve the sort of change that required rulemaking; (4) EFSC did not err in using Idaho Power's methodology to determine whether the transmission line would be likely to result in "significant adverse visual impacts" to scenic resources under OAR 345-022-0080; (5) Idaho Power was not required to include in its application an alternative route that the Bureau of Land Management had concluded was environmentally preferable, and ORS 469.370(13) did not require EFSC to order Idaho Power to amend its application to include that alternative; (6) EFSC did not err in assessing impacts on historic sites and mitigation requirements; and (7) EFSC's General Standard of Review Condition 7 in its final order was not substantively different from OAR 345-025-0006(5).

The final order of the Energy Facility Siting Council is affirmed.

On judicial review from the Energy Facility Siting Council.*

Karl G. Anuta, Law Office of Karl G. Anuta, PC, Portland, argued the cause and filed the brief for petitioner STOP B2H Coalition. Also on the briefs was Mike J. Sargetakis, Crag Law Center, Portland.

Hailey R. McAllister, Oakland, California, argued the cause for petitioner Michael McAllister. Jesse A. Buss, Willamette Law Group, PC, Oregon City, filed the brief for petitioner on review. Also on the brief was Hailey R. McAllister, Oakland, California.

Irene Gilbert, La Grande, filed the brief *pro se*.

Patricia G. Rincon, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondents Oregon Department of Energy and Oregon Energy Facility Siting

---

* Judicial review of a Final Order of the Energy Facility Siting Counsel dated September 27, 2022, Kent Howe, Vice Chair.

Council. Patricia G. Rincon, Assistant Attorney General, Salem, filed the briefs for those respondents in S069919 and S069920. Denise G. Fjordbeck filed the brief for those respondents in S069924. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Sara Kobak, Schwabe Williamson & Wyatt, PC, Portland, argued the cause and filed the briefs for respondent Idaho Power Company. Also on the briefs were Andrew J. Lee, Portland, and Lisa Rackner and Jocelyn C. Pease, McDowell Rackner & Gibson, PC, Portland.

Anne Morrison, La Grande, filed the brief for *amicus curiae* Anne Morrison, Attorney.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, Bushong, and James, Justices.**

BUSHONG, J.

The final order of the Energy Facility Siting Council is affirmed.

_____

** Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case.

**BUSHONG, J.**

Petitioners seek review of an order of the Energy Facility Siting Council (EFSC) approving an Idaho Power Company (Idaho Power) application for a site certificate to construct a high-voltage electrical transmission line from Boardman, Oregon, to Hemingway, Idaho. Petitioner STOP B2H Coalition (Stop B2H) contends that EFSC erred in the following ways: (1) denying Stop B2H's request for full party status in the contested case proceedings; (2) granting an exception or variance to noise level requirements; (3) modifying the governing rule to limit the noise assessment to landowners within one-half mile of the transmission line; and (4) misapplying EFSC's rules on the visual impacts from the transmission line.

Petitioner Michael McAllister (McAllister) contends that EFSC erred by failing to require Idaho Power to include in its application an "environmentally preferable" location for a segment of the transmission line in Union County.

Petitioner Irene Gilbert (Gilbert) contends that EFSC erred by (1) denying Gilbert's request for full party status; (2) failing to document the impacts on historic properties and mitigation measures; (3) delegating future approval of mitigation plans to the Oregon Department of Energy (ODOE); (4) relying on federal standards to determine mitigation requirements for historic properties; and (5) modifying a mandatory site certificate condition without rulemaking.

Applying the governing standard of review, we affirm EFSC's final order approving the site certificate for this transmission line for the reasons stated below.[1]

## I. BACKGROUND

A.  *Statutory Framework*

A high-voltage transmission line is an "energy facility" that cannot be constructed or operated in Oregon without a site certificate from EFSC.[2] ORS 469.300(11) (defining

---

[1] We consolidate the three petitions for purposes of this opinion only.

[2] EFSC consists of seven public members appointed by the Governor, subject to confirmation by the Senate. ORS 469.450(1). ODOE is responsible for providing staff support and funding for EFSC. ORS 469.450(6).

"energy facility"); ORS 469.320 (site certificate require-
ment). The process starts when the applicant submits a
notice of intent to apply for a site certificate. ORS 469.330(1).
ODOE then issues a project order that identifies all stat-
utes, administrative regulations, and other requirements
that the applicant must satisfy to obtain the site certificate.
ORS 469.330(3). The applicant must submit evidence of com-
pliance with all project order requirements in its site certif-
icate application. ORS 469.350.

If ODOE determines that an application is com-
plete, it issues a draft proposed order and gives the public
an opportunity to comment. ORS 469.350(4); ORS 469.370.
EFSC then conducts a contested case on issues raised during
the public comment period in accordance with ORS chapter
183 and any procedures adopted by EFSC. ORS 469.370(5).[3]
Only issues raised with sufficient specificity during the pub-
lic comment period may be raised in the contested case pro-
ceeding. ORS 469.370(3), (4). EFSC then issues a final order
"either approving or rejecting the application based upon the
standards adopted under ORS 469.501 and any additional
statutes, rules or local ordinances determined to be appli-
cable to the facility by the project order[.]" ORS 469.370(7).
Any party to the contested case can seek review of EFSC's
final order in this court. ORS 469.403(2), (3).

ORS 469.501(1) authorizes EFSC to adopt standards
for the siting, construction, and operation of an energy facil-
ity. The standards may address a wide variety of subjects,
including seismic hazards; protection of wilderness areas,
wildlife refuges, and scenic waterways; effects on fish and
wildlife; impacts on historic, cultural, and archaeological
resources; protection of public health and safety; impacts
on recreation, scenic, and aesthetic values; consistency with
the state energy policy; compliance with statewide plan-
ning goals; soil protection; and other subjects. ORS 469.501
(1)(a) - (o).

To issue a site certificate, EFSC must find by a pre-
ponderance of the evidence that the facility complies with
(1) the standards adopted by EFSC and (2) "all other Oregon

---

[3] By rule, EFSC appoints a hearing officer "to conduct a contested case pro-
ceeding on behalf of the Council." OAR 345-015-0023(1).

statutes and administrative rules" that apply to the proposed facility, unless EFSC finds that full compliance is not required. ORS 469.503(1), (3). If the facility does not fully comply with all applicable standards, EFSC may still issue the site certificate if it finds that "the overall public benefits of the facility outweigh any adverse effects on a resource or interest protected by the applicable standards the facility does not meet." ORS 469.501(3)(a); ORS 469.503(1).

The stated purpose of this statutory scheme is to establish "a comprehensive system for the siting, monitoring and regulating of the location, construction and operation of all energy facilities in this state." ORS 469.310. As part of this "comprehensive system," the statute provides that a site certificate "shall bind the state and all counties and cities and political subdivisions in this state as to the approval of the site and the construction and operation of the facility." ORS 469.401(3). State agencies and local political subdivisions must issue any permits, licenses, and certificates required by the site certificate. *Id.* On administrative or judicial review of any permitting decision, the only issue is whether the permit is consistent with the site certificate. *Id.*

We examined this statutory scheme in *Marbet v. Portland Gen. Elect.*, 277 Or 447, 449, 561 P2d 154 (1977), "the first contested proceeding under the energy facility siting act" after its enactment in 1971. There, we pointed out that the statute "assigns the council a wide range of duties relating to power facilities in this state." *Id.* at 450. The statute "reflects a legislative policy to centralize these responsibilities in the council." *Id.* Regulatory concerns "previously pursued through *** separate agencies are now to find expression through special advisory groups, *** interagency coordination, *** and in the council's procedures." *Id.*

B.   *Proceedings Below*

The following overview—summarized from EFSC's final order and not disputed by the parties—provides context for the issues raised in this case.

Idaho Power submitted its notice of intent to apply for a site certificate for the transmission line at issue in

August 2008. Over the course of the next 10 years, Idaho Power engaged in community outreach and a series of public meetings to obtain input and refine the proposed project. Seventeen different agencies, including the Oregon Department of Fish and Wildlife and the United States Department of the Interior Bureau of Land Management (BLM),[4] participated and offered comment.

ODOE issued its first project order in March 2012, and Idaho Power submitted its preliminary application for a Site Certificate in February 2013. Over the next five years, ODOE amended the project order twice, while Idaho Power amended its preliminary application, partly in response to input from the public and other agencies.

One such agency was BLM. The National Environmental Policy Act (NEPA) had required BLM to prepare an Environmental Impact Statement (EIS) for the project. 42 USC §§ 4321 - 4370. BLM had issued its final EIS in November 2016 and issued its Record of Decision (ROD) a year later. In its EIS and ROD, BLM had listed an alternative route for one segment of the transmission line in Union County—known as the Glass Hill route—as "environmentally preferable."

Idaho Power had included that route—along with other alternatives—in its preliminary application, but it did not include the Glass Hill route in its amended application. In written testimony, Idaho Power explained why it decided not to include the Glass Hill route:

> "*** Idaho Power has worked to develop an acceptable route through Union County for over a decade. Early on, Idaho Power considered the Glass Hill Route, along with at least one other route in the vicinity of Morgan Lake. However, the Glass Hill Route was confronted with substantial backlash from the affected landowners and other interested parties, some of which formed the Glass Hill Coalition specifically to challenge that route. The Confederated Tribes of the Umatilla Indian Reservation also expressed disfavor for the Glass Hill Route due to impacts to cultural resources. The Morgan Lake Alternative was developed

---

[4] BLM was involved because some segments of the proposed transmission line would cross federal lands managed by BLM.

in response to those concerns, as well as in response to a request made by one of the affected landowners during the federal National Environmental Policy Act ('NEPA') process to locate the route close to the border of their property rather than bisecting it. The Mill Creek Route was also developed during the NEPA process, in response to the County's request to site the Project in parallel with the existing 230-kv line."

In September 2018, Idaho Power finalized its application. ODOE issued a draft proposed order recommending approval of the application, and EFSC appointed a hearing officer; public notice was given, and a public comment period was opened. Petitioners Stop B2H, McAllister, and Gilbert submitted comments during that public comment period. In July 2020, ODOE issued a proposed order and set a deadline for interested parties to request party status in the contested case proceedings. Over 50 petitioners—including, as relevant here, Stop B2H and Gilbert—asked to participate as full parties.

In late 2020, the hearing officer issued an order on the petitions for party status, granting only limited party status to Stop B2H and Gilbert, among others. Stop B2H and Gilbert appealed that ruling to EFSC. EFSC conducted a hearing and ultimately agreed with the hearing officer that Stop B2H and Gilbert would only be allowed to participate in the contested case proceeding as limited parties.

The hearing officer issued the first case management order for the contested case proceedings in January 2021 and began receiving witness testimony and other evidence. The evidentiary record for the contested case closed on January 31, 2022. The hearing officer issued a proposed contested case order on May 31, 2022. EFSC conducted a hearing on the hearing officer's proposed contested case order in August 2022. EFSC then issued a draft final order and held its final hearing on September 27, 2022. After that hearing, the EFSC members voted unanimously to approve Idaho Power's application.

EFSC's final order, dated September 27, 2022, is 729 pages long (excluding attachments). The order describes the procedural history, opportunities for public input, and the

proposed facility—including the corridor assessment establishing the locations for this 300-mile transmission line—in detail. The order also includes detailed findings and conclusions regarding compliance with the standards established by EFSC and other applicable statutes and regulations, including the standards for noise, visual impacts, effects on historic properties, and mitigation that had been raised in this case. Stop B2H, McAllister, and Gilbert filed timely petitions for review of that order pursuant to ORS 469.403(3).

C.   *Standard of Review*

“We review final orders of the council for errors of law, abuse of agency discretion, and lack of substantial evidence in the record to support the challenged findings of fact.” *Save Our Rural Oregon v. Energy Facility Siting*, 339 Or 353, 356, 121 P3d 1141 (2005); *see* ORS 469.403(6); ORS 183.482(7), (8).

Many of the parties’ assignments of error require us to construe and apply various provisions of the energy facility siting act. In construing the statute, we attempt to discern the intent of the legislature that enacted it. ORS 174.020; *State v. McDowell*, 352 Or 27, 30, 279 P3d 198 (2012) (“[o]ur task is to discern what the legislature contemplated in enacting” the statute at issue). To discern that intent, we give primary weight to the statutory text in context, with appropriate additional weight accorded to any relevant legislative history. *City of Portland v. Bartlett*, 369 Or 606, 610, 509 P3d 99 (2022); *State v. Gaines,* 346 Or 160, 171-72, 206 P3d 1042 (2009). Context “includes other provisions of the same statute and other related statutes,” *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993), and “case law interpreting the statute at issue and related statutes, including earlier versions of those statutes,” *SAIF v. Walker*, 330 Or 102, 109, 996 P2d 979 (2000).

Some assignments of error require us to apply agency rules and review EFSC’s interpretation of those rules. We review an agency’s interpretation of a rule to see if the agency has “erroneously interpreted a provision of law.” ORS 183.482(8)(a). Where “the provision of law” at issue is the rule itself, and the agency offers a “plausible interpretation” of that rule, then “there is no basis on which this court

can assert that the rule has been interpreted 'erroneously'" unless the interpretation is "shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law." *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994).

## II. DISCUSSION

### A. *Stop B2H's Assignments of Error*

#### 1. *First Assignment: Denial of Full Party Status*

Stop B2H applied to be a full party in the contested case proceedings but was only allowed to participate as a limited party. Stop B2H contends that EFSC has no authority to override its choice to participate as a full party.

The Oregon Administrative Procedures Act (APA) defines "party" to include any person or entity "requesting to participate before the agency as a party or in a limited party status which the agency determines either has an interest in the outcome of the agency's proceeding or represents a public interest in such result." ORS 183.310(7)(c). The model rules promulgated by the Attorney General for contested case proceedings—adopted by EFSC, OAR 345-001-0005— further address party status: "Persons who have an interest in the outcome of the agency's contested case proceeding or who represent a public interest in such result may request to participate as parties or limited parties." OAR 137-003-0005(1). The rule goes on to state, "A petition to participate as a party may be treated as a petition to participate as a limited party." OAR 137-003-0005(8). If the agency grants a petition to participate, "the agency shall specify areas of participation and procedural limitations as it deems appropriate." OAR 137-003-0005(9).

Under the model rules, an agency is not bound by the party's "request" and is authorized to treat a party's petition to participate as a party "as a petition to participate as a limited party."[5] That conclusion is supported by our recent decision in *Friends of Columbia Gorge v. Energy*

---

[5] OAR 137-003-0005(8) uses the passive voice: A petition to participate "may be treated" as a petition to participate as a limited party. In context, the only logical reading is that the agency is the actor with the authority to treat a petition to participate as a party as a petition to participate as a limited party.

*Fac. Siting Coun.*, 368 Or 123, 486 P3d 787 (2021). There, we held that certain procedural rules adopted by EFSC were invalid because they restricted "the participatory rights of all parties, in a manner not allowed by the APA." *Id.* at 133.

In reaching that conclusion, we discussed the legislative history of the APA provisions on "parties" and "limited parties" in a contested case proceeding. The statute originally distinguished between parties "entitled as of right" to participate and parties "permitted to intervene by the agency." *Id.* at 129. Parties entitled "as of right" could fully participate in the proceeding, but "the APA allowed agencies to limit the participation of intervening parties." *Id.*

A 1979 amendment to the APA "inserted the concept of limited parties into the definition of 'party' that exists today." *Id.* at 131. As a result, "a person requesting to participate before the agency—in the nature of an intervenor—might be either a full party or a limited party in a particular contested case proceeding[.]" *Id.* at 132. An agency "may * * * restrict rights of participation for limited parties in a manner that it cannot for full parties." *Id.*; *see* ORS 183.450(3) ("Persons appearing in a limited party status shall participate in the manner and to the extent prescribed by rule of the agency.").

ORS 469.370(5) provides that the applicant (Idaho Power in this case) "shall be a party to the contested case." In other words, the applicant is entitled to fully participate "as of right." EFSC "may permit any other person" who participated during the public comment period to become a party to the contested case. *Id.* The APA has always "allowed agencies to limit the participation" of parties who are "permitted to intervene by the agency." *Friends of Columbia Gorge*, 368 Or at 129.

Applying those principles here, under the energy facility siting act, EFSC "may permit" Stop B2H to participate in the contested case, just as an agency could "permit" an interested party to intervene under earlier versions of the APA. Under the model rules, EFSC could treat a petition to participate as a full party "as a petition to participate as a limited party" under OAR 137-003-0005(8), just as an

agency could limit the participation of an intervenor under earlier versions of the APA. And under the current version of the APA and the model rules, EFSC is expressly authorized to limit the participation of a party that it permitted to participate as a limited party. ORS 183.450(3); OAR 137-003-0005(9). The terminology has changed, but the agency's authority has not. We conclude that EFSC was authorized to treat Stop B2H as a limited party.

Stop B2H also argues that EFSC did not apply the factors in OAR 137-003-0005(7) in evaluating its application to be a full party. That rule provides:

"(7)   In ruling on petitions to participate as a party or a limited party, the agency shall consider:

"(a)   Whether the petitioner has demonstrated a personal or public interest that could reasonably be affected by the outcome of the proceeding;

"(b)   Whether any such affected interest is within the scope of the agency's jurisdiction and within the scope of the notice of contested case hearing;

"(c)   When a public interest is alleged, the qualifications of the petitioner to represent that interest;

"(d)   The extent to which the petitioner's interest will be represented by existing parties."

Here, EFSC's hearing officer addressed over 50 different petitions to appear, most of them asking for full party status. The hearing officer's order cited the governing rule, OAR 137-003-0005(7), and expressly discussed the public interest factor of those petitioners seeking to appear as parties, which covers factors (a) and (c) of the rule.[6] The hearing officer also stated that petitioners had shown either a personal or public interest in the outcome:

"[L]imited party status is appropriate where, as in this case, a petitioner satisfies the eligibility requirements for participation and has established a personal or public interest in the outcome of the proceeding, but is only qualified to respond to some, but not all, issues to be considered in the contested case."

___

[6] EFSC's order affirming the hearing officer's designation of limited party status for Stop B2H and Gilbert also stated that it was relying on the Attorney General's model rules for contested cases, OAR 137-003-0000 to 137-003-0092.

The hearing officer articulated its reasons for giving limited party status to most petitioners:

> "Mindful of the following considerations—the strict eligibility requirements for participation set out in ORS 469.370, OAR 345-015-0016(3), and OAR 137-003-0005; the number of petitioners with an interest in the outcome of this contested case requesting to participate as a party; the number and nature of properly raised contested case issues in this matter; and the ALJ's duties under OAR 345-015-0023(2) to, among other things, ensure a full, fair and impartial hearing, facilitate the presentation of evidence, maintain order, comply with time limits, and assist the Council in making its decision—I find it appropriate under OAR 137-003-0005(8) and (9), OAR 137-003-0040, and OAR 345-015-0083, to limit successful petitioners' participation in this contested case to the issues properly raised in their respective petitions for party status."

(Footnote omitted.)

Although the hearing officer did not expressly address factor (d)—the extent to which Stop B2H's interest would be represented by existing parties—the hearing officer allowed all limited parties to participate with respect to the issues raised in their petitions. Given the number of parties and the breadth of the issues raised, there may have been some duplication of interests represented by multiple parties, but the hearing officer's order ensured that *all* issues raised by any party would be considered during this process. Thus, the failure to expressly address factor (d) did not preclude Stop B2H from presenting all the issues it wanted to present during the contested case process. Nothing in the rule precluded the hearing officer from also considering the need to limit party status to keep the proceedings manageable.

Stop B2H does not contend that EFSC abused its discretion in granting it limited party status under that rule or challenge the evidentiary support for any factual findings. We conclude that EFSC (1) had authority to grant limited party status to Stop B2H and (2) considered the factors it was required to consider in making that determination.

## 2. *Second Assignment: Noise Level Limits*

It is undisputed that, on occasion, the "corona noise" from the transmission line will exceed the noise limits specified in OAR 340-035-0035(1)(b)(B)(i).[7] EFSC concluded that, under the circumstances, it could grant an exception to the noise standards under OAR 340-035-0035(6)(a) and a variance under ORS 467.060 and OAR 340-035-0100.[8]

Stop B2H contends that EFSC lacks authority to grant either an exception or a variance. According to Stop B2H, only the Department of Environmental Quality (DEQ) has authority to grant exceptions to the noise standards under OAR 340-035-0035(6), and only the Environmental Quality Commission (EQC) has authority to grant variances under ORS 467.060. In Stop B2H's view, if the legislature had intended to give EFSC the authority to grant exceptions and variances from noise regulations, it would have stated that expressly, as it did in ORS 469.504(2) (authorizing EFSC to grant exceptions to statewide planning goals).[9]

EFSC explained in its final order why it addressed Idaho Power's requests for an exception and variance instead of referring Idaho Power to EQC and DEQ. EFSC stated that it "assumes the authority as the decision maker to interpret and implement" the noise rules because (1) "the Legislative Assembly withdrew all funding for implementing and

---

[7] As described in EFSC's final order, corona noise "is characterized by a low hum, hissing, frying, or crackling sound" that results from "small local pressure changes" causing energy dissipation "near the surface of * * * conductors." Corona noise may be perceptible at some locations "during occasional foul weather events."

[8] The statute and rules do not define "exception" and "variance" for purposes of the noise standards statute. Those terms are commonly used in zoning laws, however. In that context, an "exception" generally means a predefined circumstance to which a general regulation would not apply; a "variance" is a decision to not apply a regulatory requirement so as to avoid undue hardship to the applicant. *See Application of Devereux Found.*, 351 Pa 478, 483, 41 A2d 744, 746, *appeal dismissed*, 326 US 686, 66 S Ct 89, 90 L Ed 403 (1945); *Mitchell Land Co. v. Planning & Zoning Board Of Appeals*, 140 Conn 527, 531-33, 102 A2d 316, 318-19 (1953); *see generally* Sara C. Bronin and Dwight H. Merriam, 3 *Rathkopf's Law of Zoning and Planning* § 58.3, 58-10-11 (4th ed 2018). Those definitions are consistent with how those terms are used here.

[9] ORS 469.504(2) states that EFSC "may take an exception" to a statewide planning goal under certain circumstances. Similarly, ORS 469.501(2) states that EFSC "may adopt exemptions from any need standard" adopted under the state energy policy.

administering" the noise program as stated in OAR 340-035-0110; and (2) it had received a management directive from DEQ as part of the contested case authorizing EFSC to "review applications to ensure that proposed facilities meet the State noise regulations." The rule cited by EFSC states that EQC and DEQ have "suspended administration of the noise program, including but not limited to processing requests for exceptions and variances[.]" OAR 340-035-0110.

Thus, EFSC addressed Idaho Power's requests for an exception or variance only because EQC and DEQ had made it clear by rule—and confirmed in the directive to EFSC—that EQC and DEQ would not address those requests.[10] Under those circumstances, it would have been futile for EFSC to refer Idaho Power's exception/variance requests to EQC and DEQ.

The question, though, is whether EFSC's practical solution to this problem exceeded its authority under those circumstances. We conclude that it did not. The energy facility siting act (1) grants EFSC authority to adopt standards for a particular facility in a wide variety of areas that otherwise would be governed by other state agencies (ORS 469.501(1)); (2) authorizes EFSC to approve a site certificate based on those standards "and any additional statutes, rules or local ordinances" that may apply (ORS 469.370(7)); (3) makes EFSC's decision to issue a site certificate binding on all state agencies and local governments and requires them to "promptly issue" any permits, licenses, and certificates required by the site certificate[11] (ORS 469.401(3)); and (4) authorizes EFSC to issue a site certificate even if

---

[10] Compare EFSC's decision to grant Idaho Power's requests for an exception to and variance from the noise standards with EFSC's response to Idaho Power's request for an exemption from the reforestation requirements of the Oregon Forest Practices Act (FPA), ORS 527.610 to 527.770. EFSC stated in that context that it "does not assert jurisdiction of the FPA" and directed Idaho Power "to submit its request for exemption directly to the Oregon Department of Forestry." That statement supports the conclusion that EFSC addressed the requests for an exception to and variance from the noise standards only because EQC and DEQ had suspended processing those requests.

[11] An example of EFSC's authority to direct other agencies to issue permits otherwise required by state law, subject only to the conditions in the site certificate, is found in EFSC's direction to the Department of State Lands to issue a removal-fill permit for wetlands affected by the project, subject only to the conditions specified in the site certificate.

the facility does not meet all applicable standards if EFSC determines that "the overall public benefits of the facility outweigh any adverse effects on a resource or interest protected by the applicable standards the facility does not meet" (ORS 469.501(3)(a) and ORS 469.503(1)).

Stop B2H's contention that the legislature intended to give EFSC authority to grant exceptions only where the statute stated that authority expressly—as in ORS 469.501(2) and ORS 469.504(2)—is inconsistent with the legislature's broad grant of statutory authority to EFSC throughout the energy facility siting act as summarized above. We conclude that EFSC had the authority to grant (1) an exception to the noise standards under OAR 340-035-0035(6)(a), and (2) a variance under OAR 340-035-0100 and ORS 467.060.[12]

Stop B2H also contends that, even if EFSC had the authority to grant a variance or an exception, it erred in doing so because the criteria for granting an exception or a variance were not met. Stop B2H primarily contends that noise violations are not "unusual or infrequent" as required for an exception under OAR 340-035-0035(6)(a).[13] Stop B2H contends that the evidence in the record established that weather would cause noise violations 48 days a year, which (it argues) is more than "unusual or infrequent."

EFSC determined that noise exceedances would be unusual or infrequent based on the evidence showing that exceedances may occur only in less than two percent of the total hours in a year. To the extent Stop B2H contends that EFSC committed a legal error in interpreting what is meant by "unusual or infrequent" under the rule, we see no error. Nothing in the rule or statute required EFSC to use the number of days instead of the percentage of hours in assessing whether noise exceedances would be unusual

---

[12] We need not decide whether EFSC could exercise this broad statutory authority absent the unusual circumstances presented here given EQC and DEQ's decision to suspend processing requests for exceptions and variances.

[13] Stop B2H also contends in its brief that the requirements for a variance in paragraphs (1)(b) through (d) of ORS 467.060 are not met, but it does not address a variance under paragraph (1)(a) of ORS 467.060 for noise exceedances resulting from conditions "that are beyond the control" of Idaho Power.

or infrequent.[14] To the extent Stop B2H is challenging the evidentiary support for the factual findings underlying the exception and variance granted by EFSC, we review that issue for substantial evidence in the record.

First, we conclude that there was substantial evidence supporting the grant of an exception. EFSC explained in its final order its reason for granting an exception for unusual or infrequent events:

> "* * * Council finds that exceedances along the transmission line would be an infrequent event because exceedances are expected to occur less than two percent of the total hours in a given year (because they are projected to occur during foul weather, and foul weather events are infrequent in the project area, and other circumstances need to occur simultaneously to result in an exceedance, i.e., low ambient noise environment and transmission line operating at full capacity). Therefore, under OAR 340-035-0035(6)(a)[,] Council grants an exception to the facility, subject to the noise control conditions described in this Order."

That conclusion was based on weather data evaluated by a meteorologist and detailed sound measurement studies summarized in the final order. That evidence constitutes substantial evidence supporting EFSC's conclusion that noise exceedances would be "unusual or infrequent," thereby justifying an exception under OAR 340-035-0035(6)(a).

Second, we also conclude that there was substantial evidence to support granting a variance. Idaho Power had requested a variance from the "ambient antidegradation standard" in OAR 340-035-0100.[15] Based on the noise analysis studies and weather data summarized in the final order, EFSC granted a variance to the ambient antidegradation

---

[14] Stop B2H does dispute EFSC's finding that noise exceedances will occur in less than two percent of the total hours per year.

[15] "Ambient [n]oise" is defined in the regulations as "the all-encompassing noise associated with a given environment, being usually a composite of sounds from many sources near and far." OAR 340-035-0015(5). The "ambient antidegradation standard" established in the rule means that a noise source may not "cause or permit" an increase of ambient noise levels by more than 10 dBA (decibels adjusted to human hearing using the A-weighting scale (soft)) in any one hour or exceed the levels specified by the rules at an appropriate measurement point. OAR 340-035-0035(1)(b)(B)(i).

standard for the transmission line "at any time of day or night during foul weather events (defined as a rain rate of 0.8 to 5 millimeters per hour)." EFSC's final order first explains that "ambient antidegradation standard exceedance[s] are predicted during foul weather conditions" and Idaho Power "cannot be accountable for weather conditions that may cause audible corona noise, as the weather is a condition beyond its control." EFSC also found that "strict compliance with the ambient antidegradation standard in DEQ rule is inappropriate, unreasonable, or impractical because of special physical conditions and special circumstances contributed to the applicant's proposed transmission line location relating to NSRs [noise-sensitive receptors] that may experience noise exceedances." Finally, EFSC found that strict compliance with the rule "would result in substantial curtailment or closing down (never building) the proposed transmission line and that *** there is not another alternative facility available."

Stop B2H disagrees with EFSC's findings and conclusions, but it has not demonstrated that the findings are unsupported by substantial evidence given the studies and analyses summarized in the final order, and it has not persuaded us that EFSC's conclusions are legally erroneous in any respect.

   3.   *Third Assignment: Modifying Rule to Limit Noise Assessment to Landowners Within One-Half Mile of the Transmission Line*

*Former* OAR 345-021-0010(1)(x)(E) (Jan 1, 2019) generally requires applicants to submit a list of noise-sensitive landowners within one mile of the proposed facility.[16] Here, ODOE's project order only required Idaho Power to list landowners within a half mile of the transmission line "because of the linear nature of the proposed facility." Stop B2H contends that ODOE could not change the one-mile requirement by project order without engaging in rulemaking.

---

[16] At the time of the agency proceedings, that regulation was numbered OAR 345-021-0010(1)(x). Rule amendments have shifted those provisions to OAR 345-021-0010(1)(y). We refer to the former version of the rule, subsection (1)(x), for consistency with citations in the agency record.

However, the existing rule states that ODOE "may waive or modify those requirements that [ODOE] determines are not applicable to the proposed facility." OAR 345-021-0000(4). The rule further provides that the project order may identify "any appropriate modifications to applicable provisions of this rule." OAR 345-021-0010(1).

Here, ODOE in effect modified the one-mile requirement—or determined that the one-mile requirement was "not applicable" to this transmission line—in a way that was authorized by the rule. When a rule expressly authorizes an agency to modify a condition to address a specific case, the modification is not an amendment of the rule. A rule is an agency directive "of general applicability." ORS 183.310(9). An agency action "directed to a specific person or entity" is not a generally applicable rule. *Pen-Nor, Inc. v. Oregon Dept. Higher Ed.*, 84 Or App 502, 507-08, 734 P2d 395 (1987). Here, ODOE's modification of the one-mile requirement applied only to the site certificate for this specific proposed transmission line. That modification is not a rule of general applicability that would apply to other projects.

Thus, rulemaking was not required. There was no legal error in modifying the one-mile requirement specified in *former* OAR 345-021-0010(1)(x)(E) (Jan 1, 2019) for this transmission line. Stop B2H does not contend that ODOE abused its discretion in making that modification or challenge the evidentiary support for any factual findings.[17]

4.   *Fourth Assignment: Assessing Visual Impacts*

Under OAR 345-022-0080(1), EFSC can issue a site certificate only if "the design, construction and operation of the facility, taking into account mitigation, are not likely to result in significant adverse visual impacts to significant or important scenic resources." "Significant" is defined in part to mean "having an important consequence * * * based upon the magnitude and likelihood of the impact on the affected human population[.]" OAR 345-001-0010(29).

---

[17] EFSC's final order required Idaho Power to address noise impacts on landowners of noise-sensitive properties within one mile of the facility for any landowner "who nevertheless believes that exceedances above the ambient degradation standard have occurred at their NSR property."

Stop B2H contends that Idaho Power's methodology for assessing the visual impacts of the transmission line was flawed because it failed to account for viewers' subjective perceptions and reactions when determining whether a potential impact was going to be "significant." However, nothing in the rule required Idaho Power to utilize a particular methodology or specifically account for subjective perceptions and reactions in assessing whether the transmission line would be likely to result in "significant adverse visual impacts" to scenic resources.

Moreover, as explained in the final order, the methodology used to assess the visual impacts of the transmission line *did* take viewers' subjective perceptions into account. Idaho Power developed a detailed visual-impact assessment methodology and prepared a comprehensive visual impact study. The assessment "incorporated the BLM visual 'sensitivity level' criterion and the [US Forest Service] visual 'concern' criterion into its methodology, both of which measure the degree to which viewers subjectively value a visual resource."[18]    Stop B2H disagrees with *how* the methodology took subjective perceptions into account and the conclusions EFSC reached in assessing the visual impacts of the facility, but Stop B2H has not identified a legal error in EFSC's use of Idaho Power's methodology to assess whether the transmission line would result in significant adverse visual impacts to scenic resources. Stop B2H does not challenge the evidentiary support for any factual findings or contend that EFSC abused its discretion in assessing the visual impacts of the transmission line.

## B. *McAllister's Assignment of Error*

As noted above, for a portion of the transmission line running through Union County, Idaho Power's preliminary application included an alternative known as the Glass Hill route, but the final application did not include the Glass Hill route, proposing instead two other alternative routes

---

[18] The study concluded that, without mitigation, the facility might cause significant visual impacts at certain points—including near the National Historic Oregon Trail Interpretive Center outside of Baker City—but EFSC required mitigation (including, among other things, modified H-frame tower structures) to lessen the visual impacts at those locations, consistent with EFSC's siting standards.

for that segment of the line. During the public comment period and contested case proceedings, McAllister argued that the Glass Hill route should be chosen because BLM had identified that route during the NEPA process as the "environmentally preferable" alternative. EFSC concluded that McAllister's argument that EFSC must consider the Glass Hill alternative route under ORS 469.370(13) was outside the scope of its jurisdiction.

McAllister contends here that ORS 469.370(13) required Idaho Power to include that "environmentally preferable" alternative in its application for EFSC's full consideration. In response, Idaho Power and the state contend that (1) McAllister did not preserve that argument for judicial review, because he did not cite ORS 469.370(13) during the public comment period; (2) EFSC correctly rejected the argument as outside the scope of its jurisdiction; and (3) the argument fails on its merits.

We need not decide the preservation issue, because we agree with Idaho Power and the state that the argument fails on its merits.[19] Before addressing the merits, however, we first address the jurisdictional argument.

ORS 469.370(7) authorizes EFSC to review "the application" for compliance with EFSC conditions and other legal standards. According to Idaho Power and the state, Idaho Power's decision to delete the Glass Hill route from its application removed that alternative from EFSC's jurisdiction, under *Teledyne Wah Chang v. Energy Fac. Siting Council*, 298 Or 240, 692 P2d 86 (1984). We disagree in part.

In *Teledyne Wah Chang*, EFSC had approved a site certificate for a waste disposal facility at a location different from the location specified in the application. We reversed, noting that the statutory standard governing this type of facility required EFSC to determine whether "the site" specified in the application "is suitable for disposal of such wastes." *Id.* at 258 (citing ORS 469.375). We explained that "[t]his [statutory] standard does not permit the Council to reject a proposed site because it believes another location is

---

[19] McAllister cited ORS 469.370(13) in the contested case proceedings but did not cite the statute in advocating for the Glass Hill route during the public comment period.

better. EFSC was obligated to accept or reject the [site] on its own merits, rather than engaging in a comparison." *Id.*

The statutory standard at issue here is different. This transmission line traverses a 300-mile "corridor." It is not placed on a single "site" that is subject to EFSC review to determine whether that site is "suitable" for the proposed facility. The statute governing EFSC's review of a transmission line application broadly requires EFSC to review "the application" for compliance with legal standards and issue a final order "either approving or rejecting" that application. ORS 469.370(7). Unlike an application for a waste disposal facility, an application for a transmission line must include a "corridor selection assessment explaining how the applicant selected the corridors for analysis in the application." OAR 345-021-0010(1)(b)(D).[20]

Thus, Idaho Power and the state are correct that EFSC is limited to reviewing the application, but reviewing the application did not necessarily remove from EFSC's jurisdiction an alternative route that Idaho Power addressed during the corridor selection assessment process. Because McAllister has not challenged the corridor selection assessment process, we decline to further address EFSC's review of that process. We turn to the merits of McAllister's argument that ORS 469.370(13) required EFSC to approve the Glass Hill route.

ORS 469.370(13) states:

"For a facility that is subject to and has been or will be reviewed by a federal agency under the National Environmental Policy Act, 42 U.S.C. Section 4321, et seq., the council shall conduct its site certificate review, to the maximum extent feasible, in a manner that is consistent with and does not duplicate the federal agency review. Such coordination shall include, but need not be limited to:

"(a)  Elimination of duplicative application, study and reporting requirements;

---

[20] The rule requires the applicant to "discuss the reasons for selecting the corridors, based upon the evaluation" of the factors listed in the rule. OAR 345-021-0010(1)(b)(D). The factors include "[l]east disturbance to streams, rivers and wetlands" and "[l]east disturbance to areas where historical, cultural or archaeological resources are likely to exist." *Id.*

"(b) Council use of information generated and documents prepared for the federal agency review;

"(c) Development with the federal agency and reliance on a joint record to address applicable council standards;

"(d) Whenever feasible, joint hearings and issuance of a site certificate decision in a time frame consistent with the federal agency review; and

"(e) To the extent consistent with applicable state standards, establishment of conditions in and site certificate that are consistent with the conditions established by the federal agency."

Thus, the text of the statute only required EFSC's "coordination" with BLM and required it to conduct its site review, "to the maximum extent feasible," in a manner that was "consistent with and d[id] not duplicate" the BLM review. It also required EFSC to establish conditions in the site certificate "that [were] consistent with the conditions established by the federal agency." ORS 469.370(13)(e).

"Coordination" means the "combination in suitable relation for most effective or harmonious results." *Webster's Third New Int'l Dictionary* 502 (unabridged ed 2002). "Consistent with" generally means "marked by harmony, regularity, or steady continuity throughout" or "coexisting and showing no noteworthy opposing, conflicting, inharmonious, or contradictory qualities or trends." *Id.* at 484. Those terms govern EFSC's process—that is, the "manner" in which EFSC must "conduct its site certificate review"—but they do not mandate any particular result, including choosing a route deemed preferable during the NEPA process.

Moreover, NEPA "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F3d 800, 814 (9th Cir 1999) (internal quotation marks omitted); *see also Robertson v. Methow Valley Citizens Council*, 490 US 332, 350, 109 S Ct 1835, 104 L Ed 2d 351 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

Thus, identifying an "environmentally preferable" alternative under NEPA does not mean that selecting that alternative is a condition for approval, even for a *federal* project. Without that condition, McAllister cannot show that EFSC's approval of the two alternative routes proposed by Idaho Power results in inconsistency between state and federal regulatory review. It follows that Idaho Power was not required to include the environmentally preferable alternative in its application, and ORS 469.370(13) did not require EFSC to order Idaho Power to amend its application to include that alternative.

McAllister also contends that EFSC effectively denied him a fair process to advocate in favor of the Glass Hill alternative. But as noted above, McAllister was able to present his arguments in favor of the Glass Hill alternative during the public comment period and the contested case proceedings. Idaho Power explained as part of the corridor selection assessment why it chose not to include the Glass Hill alternative in its final application. And we have addressed the merits of McAllister's legal argument under ORS 469.370(13). Under the circumstances, we do not agree that McAllister has been denied a fair opportunity to present his argument.

C.  *Gilbert's Assignments of Error*

1.  *First Assignment: Denial of Full Party Status*

Gilbert appears to contend that EFSC was legally required to grant her request for full party status. We disagree, for the reasons stated above on Stop B2H's first assignment of error.

2.  *Second, Third, and Fourth Assignments: Impacts on Historic Sites and Mitigation Efforts*

These assignments of error all involve EFSC's treatment of historic sites. ORS 469.501(1) requires EFSC to adopt standards addressing:

"Impacts of the facility on historic, cultural or archaeological resources listed on, or determined by the State Historic Preservation Officer to be eligible for listing on,

the National Register of Historic Places[21] or the Oregon State Register of Historic Properties."

ORS 469.501(1)(f). EFSC adopted those standards in OAR 345-022-0090,[22] which includes a requirement that EFSC "tak[e] into account mitigation" in determining whether the facility is "likely to result in significant adverse impacts" on those resources. "Mitigation" is defined in *former* OAR 345-001-0010(33) (June 30, 2020).[23]

      Gilbert contends in her second, third, and fourth assignments of error that Condition 2 in EFSC's final order fails to comply with those statutory and regulatory require-ments. That condition states:

---

[21] The National Historic Preservation Act, 54 USC § 306108, defines "historic property" as districts, sites, or buildings "included on, or eligible for inclusion on, the National Register [of Historic Places]." 54 USC § 300308; *see* 54 USC § 300311 (defining "National Register").

[22] OAR 345-022-0090 provides, in pertinent part:

"(1) *** [T]o issue a site certificate, the Council must find that the con-struction and operation of the facility, taking into account mitigation, are not likely to result in significant adverse impacts to:

"(a) Historic, cultural or archaeological resources that have been listed on, or would likely be listed on the National Register of Historic Places;

"(b) For a facility on private land, archaeological objects, as defined in ORS 358.905(1)(a), or archaeological sites, as defined in 358.905(1)(c); and

"(c) For a facility on public land, archaeological sites, as defined in ORS 358.905(1)(c)."

[23] *Former* OAR 345-001-0010(33) (June 30, 2020), now OAR 345-001-0010(22), states:

"'Mitigation' means taking one or more of the following actions listed in order of priority:

"(a) Avoiding the impact altogether by not taking a certain action or parts of an action;

"(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

"(c) Partially or completely rectifying the impact by repairing, rehabili-tating or restoring the affected environment;

"(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action by monitoring and tak-ing appropriate corrective measures;

"(e) Partially or completely compensating for the impact by replacing or providing comparable substitute resources or environments; or

"(f) Implementing other measures approved by the Council."

> **"Historic, Cultural, and Archaeological Resources Condition 2**: Prior to construction of a phase or segment of the facility, subject to confidential material submission procedures, and based on 1) new survey data from previously unsurveyed areas and 2) the final design of the facility, the certificate holder shall submit to [ODOE], the State Historic Preservation Office (SHPO), and applicable Tribal Governments, for review and [ODOE] approval a final Historic Properties Management Plan (HPMP) Attachment S-9 of the Final Order on [the application for the site certificate]. [ODOE] may engage its consultant to assist in review of the HPMP. The certificate holder shall conduct all construction activities in compliance with the final [ODOE]-approved HPMP."

Gilbert contends in her third assignment of error that EFSC cannot approve a site certificate subject to ODOE's future review and approval of the HPMP, reasoning that EFSC cannot make all the required findings when information is to be developed in the future outside the record of the site certificate approval proceedings.

That argument fails because ORS 469.402 expressly authorizes EFSC to delegate future review and approval to ODOE:

> "If the Energy Facility Siting Council elects to impose conditions on a site certificate or an amended site certificate, that require subsequent review and approval of a future action, the council may delegate the future review and approval to the State Department of Energy if, in the council's discretion, the delegation is warranted under the circumstances of the case."

If EFSC "elects" to impose conditions that require future review and approval and determines that delegation of that action to ODOE is "warranted under the circumstances," EFSC's decision would be subject to review for abuse of discretion. Gilbert's third assignment of error appears to suggest that EFSC abused its discretion because Idaho Power did not survey some private properties that it could have surveyed for impacts on historic sites.[24] In Gilbert's view, delegating authority to ODOE to assess

---

[24]  Gilbert acknowledges that Idaho Power lacked legal authority to enter and survey private property without the owner's consent.

the impacts on those properties in the future is an abuse of discretion because impacts could (and should) have been reviewed as part of EFSC's site certificate approval proceedings with full public participation.

Gilbert, however, does not identify any specific private properties that Idaho Power failed to review even though it had the legal authority to enter and survey during the site certificate approval process. EFSC had statutory authority to delegate that assessment to ODOE for future review. We find no abuse of discretion under those circumstances.

In her fourth assignment of error, Gilbert contends that EFSC erroneously allowed Idaho Power to use federal standards for mitigating adverse environmental effects on historic, cultural, and archaeological resources without requiring it to meet more stringent state standards.[25] We disagree.

As noted above, *former* OAR 345-001-0010(33) (June 30, 2020) lists acceptable forms of mitigation. The final order prescribes in Table HCA-4b the specific types of mitigation that EFSC required for this project: design modification (*former* OAR 345-001-0010(33)(b) (June 30, 2020)), plus "at least one of the" mitigation methods found in *former* OAR 345-001-0010(33)(c) - (e), "with a demonstrated direct benefit to affected area (county of resource site)," and with the priority of those additional mitigation methods further specified. The final order also requires Idaho Power to demonstrate that any mitigation efforts required by federal "section 106 review"[26] are sufficient to meet the state law standards articulated in Table HCA-4b:

"Mitigation established through the federal Section 106 compliance review may be used to satisfy the EFSC mitigation requirement \*\*\* if [Idaho Power] can demonstrate that it addresses both the design modifications and the

---

[25] The state contends that Gilbert failed to preserve her argument here, as she did not raise it during the contested case proceeding. For purposes of this opinion, we will assume without deciding that Gilbert sufficiently preserved the issue.

[26] "Section 106" refers to the review required by section 106 of the National Historic Preservation Act, 54 USC § 306108, which requires agencies to "take into account the effect of the undertaking on any historic property" for federal or federally-funded projects.

> restoration; preservation and maintenance; or compensation mitigation within affected area (county), as included in the below Table HCA-4b ***. If not duplicated through the federal Section 106 process, the applicant shall establish the scope and scale of Table HCA-4b mitigation, prior to construction, subject to [ODOE] review and approval, in consultation with SHPO, its consultants, or other entities with expertise with historic trails."

Thus, EFSC required Idaho Power to demonstrate that the mitigation efforts it adopted to comply with federal law would also satisfy state law.

Finally, Gilbert contends in her second assignment of error that EFSC's final order is insufficiently specific regarding the impacts on historic sites and the appropriate mitigation necessary for EFSC to "find that the construction and operation of the facility, taking into account mitigation, are not likely to result in significant adverse impacts" to historic sites, OAR 345-022-0090(1).

EFSC's final order contains specific information identifying the resources that will be impacted, the extent of those impacts, and how those impacts will be mitigated. Table HCA-2 of the order identifies specific sites and explains the mitigation measures for those sites. For example, one site (number 35MW00227), described as an "Archaeological Site—Road," is not yet evaluated for eligibility for the National Register of Historic Places, so the federal "section 106" review is not yet complete. Nevertheless, the table sets out the following mitigation information:

> "Avoid. Subsurface probing needed. If the Section 106 determination is eligible, applicant will avoid Site # 35MW227 as follows: Approved Route: For the structure work area and pulling & tension site, applicant will relocate or reduce the size of those areas to avoid Site # 35MW227; for the existing road, all improvements will be made within the existing road prism thereby avoiding any new impacts; applicant will flag any portion of the boundary of Site # 35MW227 that occurs within 100 feet of construction activity. West of Bombing Range Road Alternatives 1 & 2: No avoidance measures are necessary as there are no direct impacts proposed for these alternatives."

Gilbert does not explain why that information would be inadequate to support the findings required by OAR 345-022-0090(1). She also does not identify any specific sites that were omitted from the final order, or for which the proposed mitigation is insufficient. We see no error in the final order regarding the specificity of EFSC's assessment of impacts on historic sites and mitigation requirements.

### 3.  Fifth Assignment: Whether EFSC Changed a Mandatory Site Certificate Condition Without Rulemaking

Gilbert contends in her fifth assignment of error that EFSC changed a mandatory site certificate condition without going through the required process to amend the rule. OAR 345-025-0006 lists certain conditions that EFSC "must impose *** in every site certificate." The mandatory condition identified by Gilbert provides:

"Except as necessary for the initial survey or as otherwise allowed for wind energy facilities, transmission lines or pipelines under this section, the certificate holder may not begin construction, as defined in OAR 345-001-0010, or create a clearing on any part of the site until the certificate holder has construction rights on all parts of the site. For the purpose of this rule, 'construction rights' means the legal right to engage in construction activities. For wind energy facilities, transmission lines or pipelines, if the certificate holder does not have construction rights on all parts of the site, the certificate holder may nevertheless begin construction, as defined in OAR 345-001-0010, or create a clearing on a part of the site if the certificate holder has construction rights on that part of the site and:

"(a)  The certificate holder would construct and operate part of the facility on that part of the site even if a change in the planned route of a transmission line or pipeline occurs during the certificate holder's negotiations to acquire construction rights on another part of the site; or

"(b)  The certificate holder would construct and operate part of a wind energy facility on that part of the site even if other parts of the facility were modified by amendment of the site certificate or were not built."

OAR 345-025-0006(5).

Gilbert suggests that General Standard of Review Condition 7 in EFSC's final order is inconsistent with the mandatory condition in the rule, so rulemaking was required. Condition 7 provides:

> "**General Standard of Review Condition 7:** The certificate holder may begin construction, as defined in OAR 345-001-0010(12), or create a clearing on a part of the site if the certificate holder has construction rights on that part of the site and the certificate holder would construct and operate part of the facility on that part of the site even if a change in the planned route of transmission line occurs during the certificate holder's negotiations to acquire construction rights on another part of the site."

EFSC's final order explains that it modified the wording of the rule in drafting General Condition 7 "to remove the language of the condition that does not apply to transmission lines and maintain the portion of the condition that would apply to the facility." Gilbert does not identify any substantive difference between General Condition 7 and OAR 345-025-0006(5), and we see none.[27]

## III.   CONCLUSION

Oregon law limits our review of EFSC's final order approving Idaho Power's application for a site certificate for the Boardman-to-Hemingway high voltage electricity transmission line to errors of law, abuse of discretion, and substantial evidentiary support for factual findings. Applying that standard, we conclude that EFSC did not err in any of the ways contended by petitioners Stop B2H, McAllister, or Gilbert.

The final order of the Energy Facility Siting Council is affirmed.

---

[27] Gilbert claims that the text of the mandatory condition was changed in a footnote. Footnote 77, found on the same page of the final order as General Condition 7, contains a redline/strikeout version intended to show the changes between OAR 345-025-0006(5) and General Condition 7. Idaho Power acknowledges that that redline/strikeout version erroneously shows OAR 345-025-0006(5)(a) as being deleted.

The error was typographical and harmless. EFSC's stated intent was not to delete or change any substantive requirement of OAR 345-025-0006(5), and the text of General Condition 7 does contain the substance of OAR 345-025-0006 (5)(a). Moreover, Idaho Power must comply with the text of General Condition 7 itself, not the explanatory version contained in an erroneous footnote.