No. 13 April 10, 2025 405

IN THE SUPREME COURT OF THE
STATE OF OREGON

OREGON-COLUMBIA CHAPTER OF THE
ASSOCIATED GENERAL CONTRACTORS
OF AMERICA,
*Petitioner,*

*v.*

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

(CA A181985) (SC S071452)

En Banc

On certification from the Court of Appeals under ORS 19.405.

Argued and submitted December 9, 2024.

Joshua Dennis, Schwabe, Williamson & Wyatt, P.C., Portland, argued the cause and filed the briefs for petitioner.

Jona Jolyne Maukonen, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Donald McCullough, III, McKanna Bishop Joffe, LLP, Portland, filed the briefs for *amicus curiae* Oregon State Building and Construction Trades Council. Also on the briefs was Daniel Hutzenbiler.

BUSHONG, J.

The Oregon Department of Transportation's challenged rule is declared invalid.

Masih, J., dissented and filed an opinion, in which Flynn, C.J., and James, J., joined.

**BUSHONG, J.**

This rule challenge involves the process that the Oregon Department of Transportation (ODOT) used to establish the terms of "community benefit contracts" for certain highway improvement projects. Under a recently enacted statute, when ODOT designates a federally funded project as a "community benefit project," the contracts for those projects may include terms and conditions that address, among other things, the contractors' training and use of apprentices and the provision of employer-paid family health insurance for contractors' employees.[1] *See* ORS 279C.308(3)(b) (so stating as to apprentice and health insurance provisions); *see also* OAR 731-005-0900 (describing federal funding and setting out other requirements). ODOT and various trades councils and labor unions negotiated and signed a "Community Workforce Agreement" (CWA) that addressed the statutory provisions and established other terms and conditions that ODOT has agreed to include in its community benefit contracts.

Petitioner Oregon-Columbia Chapter of the Associated General Contractors of America (AGC) filed a challenge to the validity of the CWA in the Court of Appeals, contending that the CWA is a "rule" for purposes of Oregon's Administrative Procedures Act (APA) and that, therefore, ODOT was required to comply with the APA's notice-and-comment rulemaking procedures before it could use the CWA to establish the terms and conditions of its community benefit contracts. In response, ODOT acknowledged that it did not comply with the APA's rulemaking procedures before signing the CWA, but it contended that those procedures did not apply because the CWA is not a "rule." The Court of Appeals certified AGC's rule challenge to this court, and we accepted the certification.

Resolving the parties' dispute turns on an issue that we recently confronted for the first time in *PNW Metal Recycling, Inc. v. DEQ*, 371 Or 673, 686, 540 P3d 523 (2023), *adh'd to as modified on recons*, 372 Or 158, 546 P3d 286

---

[1] Under the governing statute, a "community benefit contract" for ODOT is a contract that applies to a public improvement project that ODOT has designated a "community benefit project." ORS 279C.308(2), (3)(a). At the time of argument in this case, ODOT had designated eight projects as "community benefits projects."

(2024) (stating that "[t]his court has not previously decided a case turning on the definition of 'rule'").[2] As we will explain, the CWA is an ODOT statement that prescribes policies that generally apply to its community benefit program. That makes it a "rule" under the APA, and ODOT was required to follow the APA's rulemaking procedures before adopting those policies. That conclusion is supported by the purposes underlying the APA's rulemaking requirements and meets the objectives served by those requirements. Accordingly, we conclude that the CWA is an invalidly promulgated rule.[3]

## I.   LEGAL AND PROCEDURAL BACKGROUND

AGC is a trade association of construction contractors; some of its members employ nonunion workers. In this dispute, on behalf of its members, AGC objects to the fact that ODOT negotiated the terms of the CWA with labor unions without complying with the APA's formal notice-and-comment rulemaking procedures, as would be required prior to the adoption of an agency rule. AGC contends that the CWA is invalid because it is a "rule" as defined by the APA, and ODOT was required to comply with the APA's notice-and-comment rulemaking procedures before it could adopt the policies set out in the CWA for its community benefit program.

In response, ODOT does not contend that the CWA itself or ODOT's process meet any statutory exception from notice-and-comment rulemaking. Rather, ODOT contends that notice-and-comment rulemaking was not required because the CWA is not a "rule" as defined by the APA.

---

[2] We concluded in *PNW Metal Recycling* that the petitioners in that case had "failed to identify a 'rule' subject to challenge under ORS 183.400." 371 Or at 701. As we will explain later in this opinion, the agency decision at issue in *PNW Metal Recycling* is significantly different from the CWA.

[3] While AGC's rule challenge was pending, AGC brought an action in Marion County Circuit Court seeking, among other things, to enjoin ODOT from using the CWA in soliciting bids for community benefit contracts until its challenge to the CWA was decided. After the circuit court granted AGC's motion for a preliminary injunction, the Oregon State Building and Construction Trades Council (relator) filed a mandamus petition in this court. We issued an alternative writ and stayed the injunction in part. As we explain in our separate opinion issued today in *Oregon-Columbia Chapter AGC v. ODOT (S071037)*, 373 Or 440, ___ P3d ___ (2025), relator's mandamus petition is mooted by our resolution of AGC's challenge to the CWA because the preliminary injunction, by its terms, expired by virtue of this decision on AGC's rule challenge.

Specifically, ODOT contends that the CWA is not a rule because (1) it is not an ODOT directive or standard; and (2) it is not "generally applicable" since it applies only to eight projects that have been designated as community benefit projects.

To place the parties' arguments in context, we begin with an overview of ODOT's community benefit program, the CWA, and the relevant provisions of the APA.

A.   *Community Benefit Program*

1.   *2021 legislation—ORS 279C.308*

In 2021, the legislature enacted a statute that addresses a specific type of public improvement project, known as a "community benefit project." Or Laws 2021, ch 488, § 2. That statute, proposed as Senate Bill (SB) 420 (2021), and codified at ORS 279C.308, defines a "community benefit project" as "a public improvement project that is subject to the terms and conditions of a community benefit contract." ORS 279C.308(1)(c). A "community benefit contract," in turn, is defined as a "public improvement contract that includes, but is not limited to, the elements described in subsection (3)(b)" of that statute. ORS 279C.308(2).

Turning to those elements, subsection (3) provides, in part, as follows:

> "(3)(a)   A contracting agency *** may enact or adopt, as appropriate, an ordinance, resolution, rule, regulation or other legislative or administrative measure that authorizes the contracting agency *** to designate a public improvement project as a community benefit contract.

> "(b)   In addition to and not in lieu of any other requirement that applies to a public improvement contract under this chapter, a public improvement contract that a contracting agency *** designates as a community benefit contract may include as material provisions of the contract, but need not be limited to, terms and conditions that require the contractor to:

> "(A)   Qualify as a training agent, as defined in ORS 660.010, or provide apprenticeship training that meets applicable federal and state standards for apprenticeship training;

"(B)   Employ apprentices to perform a specified percentage of work hours that workers in apprenticeable occupations perform on the community benefit project;

"(C)   Provide employer-paid family health insurance; and

"(D)   Meet any other requirements that the contracting agency * * * sets forth in the ordinance, resolution, rule, regulation or other legislative or administrative measure that authorizes procurements of community benefit contracts."

Next, paragraph (3)(c) of ORS 279C.308 requires contracting agencies to ensure that all "advertisements and solicitation documents" for a community benefit contract clearly state that the procurement is for a community benefit contract, and to "identify conspicuously all of the provisions to which a contractor will be subject, including the percentage of work hours for which the contractor must employ apprentices and the standards that will apply to the health plan the contractor must provide" to its workers. ORS 279C.308(3)(c)(A).[4] Subsection (4) of that statute further provides that, except as otherwise provided by the statute, "a solicitation and award for a community benefit contract is subject to all applicable provisions of the Public Contracting Code." ORS 279C.308(4); *see also* ORS 279A.005 (providing that "ORS chapters 279A, 279B and 279C may be cited as the Public Contracting Code").[5]

In sum, as relevant here, ORS 279C.308 (1) authorizes contracting agencies to adopt rules or other measures to designate public improvement projects as community benefit projects; (2) describes elements that those agencies "may include" in the contracts for those projects; (3) requires

---

[4] The statute further provides that, before accepting and evaluating bids or proposals for a community benefit contract, the contracting agency must require that "each bidder or proposer include with the bid or proposal a signed statement that acknowledges that the bidder or proposer understands and agrees to be bound by the requirements that apply to the community benefit contract." ORS 279C.308(3)(c)(B).

[5] SB 420 also amended two existing provisions of the Public Contracting Code. *See* Or Laws 2021, ch 488, § 3 (amending ORS 279C.375); § 4 (amending ORS 279C.430). The amendment to ORS 279C.375 requires a "responsible bidder" to agree "to be bound by the terms and conditions of a community benefit contract if the public improvement contract is a community benefit contract." ORS 279C.375(3)(b)(J).

those agencies to notify contractors in the "solicitation documents" that the project is a community benefit contract and "identify conspicuously" all the provisions that a contractor must meet to comply with the requirements of the community benefit contract; and (4) specifically requires agencies to comply with the Public Contracting Code in soliciting bids and awarding community benefits contracts.

2. *ODOT's community benefit rule*

After SB 420 took effect, ODOT adopted a rule that "establishes [ODOT's] Community Benefit Program." OAR 731-005-0900(2). Among other things, that rule states that ODOT's director (or designee) "may designate a public improvement contract as a community benefit contract" if certain conditions are met. *Id.* Subsection (3) of OAR 731-005-0900 specifically authorizes ODOT to enter into "community workforce agreements" with labor organizations to "develop material provisions that ODOT may include in a community benefit contract[.]" The rule defines a "community workforce agreement" as "an agreement executed by the ODOT Director [or designee] and one or more labor organizations to establish material terms that ODOT may include in a community benefit contract." OAR 731-005-0900(1)(a).

3. *The Community Workforce Agreement (CWA)*

After ORS 279C.308 was enacted, ODOT began negotiating the terms of a CWA with various trades councils and labor unions, leading to the execution of an initial CWA on October 20, 2022. The stated purpose of that CWA was to provide "additional terms and conditions for certain ODOT public improvement projects that qualify as 'Covered Projects'" as defined in the CWA. The CWA defined a "Covered Project" as "a set of ODOT-administered public improvement projects delivered through a prime contract that is procured by ODOT" and listed eight specific projects that would be considered "Covered Projects." The CWA has 22 separate sections, or "articles," that addressed a variety of subjects, including Union Recognition (Article 3); Safety (Article 5); Wages and Benefits (Article 6); Priority Worker and Apprentice Hiring Goals (Article 11); Dispatch, Referrals, and Hiring Procedures (Article 13); and Labor Peace (Article

19). The CWA also included provisions addressing the two subjects specified in ORS 279C.308(3)(b)—the training and use of apprentices (Article 11) and the provision of employer-paid family health insurance (Article 7).

The initial CWA referred to ORS 279C.308, and the parties agree that the CWA was intended to apply to only the eight projects listed in the CWA that ODOT had designated as community benefit projects. Article 1, section 2, of the initial CWA requires ODOT to "ensure that compliance with [the CWA] is a term of the Prime Contract" for each of those community benefit contracts. A "Prime Contract" under the CWA is a public improvement contract "awarded by ODOT to a General Contractor" for construction of a covered project.

The CWA was amended in May 2023, and again in September 2023. The "Amended and Conformed" CWA from September 2023 is the version at issue in this case. That CWA defines "Covered Project" as "a project subject to a Community Benefit Contract as designated per ORS 279C.308 *** and OAR 731-005-0900" and provides that ODOT "shall pursue" that designation for the eight projects identified in the CWA. The Amended and Conformed CWA generally includes the same 22 articles that were in the initial CWA. Article 1, section 2, of the Amended and Conformed CWA requires ODOT to "ensure that compliance with [the CWA] is a term of the ODOT Contract on each Covered Project."[6] ODOT began soliciting bids for the first of the Covered Projects on December 21, 2023.[7]

## B.  *APA Requirements*

Oregon's APA states that "it is the policy of this state that[,] whenever possible[,] the public be involved in the development of public policy by agencies and in the drafting of rules." ORS 183.333(1). Consistent with that policy, the APA requires agencies to give the public notice and

---

[6] The CWA defines "ODOT Contract" as "the community benefit contract awarded by ODOT to a General Contractor for construction of a Covered Project."

[7] The solicitation documents for that project, and for two other ODOT community benefit projects, did not require bidders to comply with the CWA because of the preliminary injunction entered by the Marion County Circuit Court, which is the subject of a separate mandamus proceeding in this court. *See* 373 Or at 408 n 3 (describing that proceeding).

an opportunity to comment "[p]rior to the adoption, amendment or repeal of any rule[.]" ORS 183.335(1), (3)(a).

The APA defines a "rule" as "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency." ORS 183.310(9). That definition includes the amendment or repeal of a prior rule, but it "does not include" six specified types of agency actions. ORS 183.310(9)(a) - (f) (listing exceptions).[8] In addition, an agency, in deciding a contested case, may announce "the adoption of a general policy applicable to the case and subsequent cases of like nature." ORS 183.355(6). If it does so, "the agency may rely upon the decision in disposition of later cases." *Id.*[9] The validity of a rule may be challenged in the Court of Appeals under ORS 183.400; that court may declare a rule invalid if, among other things, the court determines that a rule "[w]as adopted without compliance with applicable rulemaking procedures." ORS 183.400(4)(c).

In addition to listing exceptions to the definition of "rule," the APA also lists exceptions to the APA's notice-and-comment rulemaking procedures. *See* ORS 183.335(10) (listing exceptions). "Most public contracts, for example, are exempt from rulemaking procedures [under ORS 183.335(10)], even if they contain terms that otherwise qualify as 'rules.'" *Homestyle Direct, LLC v. DHS*, 354 Or 253, 266, 311 P3d 487 (2013).[10] The community benefit statute, ORS 279C.308, is not

---

[8] The enumerated exceptions to the definition of a "rule" are (1) internal management directives, regulations or statements of policy which do not substantially affect the interests of the public; (2) agency actions that are directed to other agencies or other units of government which do not substantially affect the interests of the public; (3) declaratory ruling issued pursuant to ORS 183.410 or ORS 305.105; (4) intra-agency memoranda; (5) executive orders of the Governor; and (6) rules of conduct for adults in custody. ORS 183.310(9)(a) - (f).

[9] In *PNW Metal Recycling*, we explained that ORS 183.355(6) is, in effect, another enumerated exception to rulemaking because that provision allows "statements of policy to be made in a contested case proceeding rather than through rulemaking." 371 Or at 689.

[10] When the legislature amended the definition of "rule" in 1971, it also added—in the same bill—a public contracting exception to the notice-and-comment rulemaking requirements. *See* Or Laws 1971, ch 734, § 1(7) (defining "rule"); *id.* § 3(4) (adding exception for ORS chapter 279, which at that time was the entire Public Contracting Code).

included in the list of statutory exemptions from rulemaking for public contracting. However, "a solicitation and award for a community benefit contract is subject to all applicable provisions of the Public Contracting Code," ORS 279C.308(4), and the provisions of that code governing the solicitation and award of public improvement contracts—ORS 279C.360 through 279C.380—are included in the list of exemptions from rulemaking procedures, ORS 183.335(10).

In this case, ODOT does not contend that the APA's definition of a rule "does not include" the CWA because it falls within one of the exceptions listed in ORS 183.310(9)(a) to (f). Nor does ODOT contend that its adoption of the CWA is exempt from rulemaking procedures under ORS 183.335(10) or any other statute. Thus, the only issue is whether the CWA is a "rule" as defined in the APA.

C.   *The Litigation*

On August 1, 2023, AGC filed a petition for judicial review in the Court of Appeals, seeking review of the CWA under ORS 183.400, which permits challenges to agency rules. AGC contended in its petition that the CWA is a "rule" that is invalid because ODOT adopted and agreed to use it in its community benefit program without complying with the notice-and-comment rulemaking procedures in the APA. The Court of Appeals certified that case to this court, and we accepted that certification.[11]

## II.   DISCUSSION

As noted, AGC contends that the CWA is a "rule" as defined in the APA, and that ODOT therefore cannot adopt or use the CWA in its community benefit program without first complying with the APA's notice-and-comment rulemaking procedures. ODOT responds that the CWA is not a "rule" under the APA because (1) it is not an ODOT directive or standard; and (2) it is not a policy of "general applicability" because it applies only to designated projects, and, therefore, ODOT was not required to comply with the

---

[11] AGC and ODOT are parties to another rule challenge that is currently pending in the Court of Appeals (Case No A180612), concerning OAR 731-005-0900. That case is not presently before us.

APA's rulemaking procedures.[12] We disagree with ODOT's contentions.

ODOT's first argument—that the CWA is not a rule because it is not a directive or standard—is contrary to the text of the APA's definition of "rule." Under the statute, the definition of "rule" is not limited to directives and standards; it is defined more broadly. "Rule" means "any agency directive, standard, regulation *or statement of general applicability* that implements, interprets or prescribes law or policy" of an agency. ORS 183.310(9) (emphasis added). Thus, an agency's "statement of general applicability" that "prescribes *** policy" can also meet that definition of a rule even if it is not a "directive or standard." Here, ODOT does not dispute that the CWA, by establishing the terms and conditions that will be part of any community benefit contract, prescribes ODOT's policy—which mirrors federal policy in many respects—regarding its community benefits program. Rather, ODOT contends that the CWA is not a rule because the statements of policy included in the CWA are not statements of "general applicability" because they only apply to eight community benefits contracts. Again, we disagree.

We addressed the "general applicability" requirement of ORS 183.310(9) in *Fremont Lumber Co. v. Energy Facility Siting Council*, 331 Or 566, 16 P3d 1147 (2001). That case involved two Energy Facility Siting Council (EFSC) rules that addressed the cleanup of uranium mine "overburden"—that is, the earth and other material overlying natural deposits of uranium ore that are removed to access the ore. *Id.* at 568 n 1. Among other things, the petitioners

---

[12] This case is a rule challenge brought under ORS 183.400. That statute defines the scope of review. We first determine whether the challenged agency action is a rule. *See, e.g.*, *PNW Metal Recycling*, 371 Or at 675 (concluding that the "rule challenge under ORS 183.400 must be dismissed" after determining that the challenged agency action was not a rule). If it is, we assess the validity of that rule by determining whether it violates the constitution, exceeds the agency's statutory authority, or was adopted in a manner that does not comply with the required rulemaking procedures. ORS 183.400(4). The dissenting opinion frames the issue differently, stating that it "does not matter" if the CWA is a rule because the key, in its view, is whether rulemaking is "mandatory" and the "sole method available" to ODOT to adopt standards for community benefit contracts. 373 Or at 434-35 (Masih, J., dissenting) (emphasis omitted). But whether rulemaking is "mandatory" does not inform whether agency action is a rule subject to review under ORS 183.400.

contended that OAR 345-050-0060—one of the amended uranium mine overburden rules—was invalid because it was not a statement of "general applicability." Specifically, the petitioners contended that the amended rule was not generally applicable because (1) it only applied to one subset of uranium mines—those subject to cooperative agreements or arrangements with federal agencies to clean up uranium mine overburden—and not all uranium mines; and (2) by amending the rule, EFSC "intended to alter the course of decision-making for only one site." *Id.* at 573.[13] We rejected both arguments.

First, we explained that the EFSC rule at issue did "not apply to *just one* cooperative agreement or arrangement." *Id.* (emphasis added). Rather, the rule "applie[d] to *any* such agreement or arrangement." *Id.* (emphasis in original). Second, we concluded that the fact that the rule might affect *only one project at a time* "does not keep the rule from being one of general applicability." *Id.* We explained that, "if other uranium mine overburdens came into existence, the cleanup of those overburdens would be subject to the rule." *Id.*

Applying those principles here supports the conclusion that the CWA is a statement of "general applicability" even though it currently applies only to the eight projects that ODOT has identified as community benefit projects and not all ODOT public improvement projects. The fact that the EFSC rule challenged in *Fremont Lumber* applied only to one subset of uranium mines—those that were subject to a federal cooperation agreement—and not all uranium mines did not mean that it was not generally applicable because it applied to *all* uranium mines that were subject to cooperative agreements or arrangements with federal agencies.

Similarly, the fact that the CWA applies only to ODOT's community benefit projects and not all ODOT public improvement projects does not mean that it is not generally applicable because it applies to *all* ODOT community benefit

---

[13] To be clear, the rule at issue in *Fremont Lumber* on its face did not affect only one project at a time. *See* 331 Or at 569 (quoting the challenged rule, OAR 345-050-0060). The petitioner had argued that, in amending the rule, the agency "intended to alter the course of decision-making for only one site." *Id.* at 573. We rejected that argument because, even assuming that petitioner was correct that the amended rule would affect "only one active project at any point in time," that "does not keep the rule from being one of general applicability." *Id.*

projects. And, although there are only eight projects currently designated as community benefit projects, ORS 279C.308 and OAR 731-005-0900 expressly authorize ODOT to designate additional projects as community benefit projects. And, as discussed above, the CWA's definition of a "Covered Project" includes *all* projects that are so designated, not just the eight projects that are currently designated as community benefit projects. Thus, if ODOT designates additional community benefit projects in the future, those projects will be "Covered Projects" under the CWA. In that sense, the CWA is comparable to the EFSC rule at issue in *Fremont Lumber*, which by its terms applied to any future uranium mine overburdens, not just the one active mine that was covered by the rule when EFSC amended it. That was enough to make the rule in *Fremont Lumber* generally applicable; the same is true here.

The conclusion that the CWA is a "rule" and thus invalid because ODOT failed to engage in notice-and-comment rulemaking is consistent with the history and structure of the APA and the objectives served by its rulemaking procedures, as summarized by former Attorney General David Frohnmayer. *See* David B. Frohnmayer, *Oregon Administrative Procedure Act: An Essay on State Administrative Rulemaking Procedure Reform*, 58 Or L Rev 411, 416-22 (1980) (discussing, among other things, the "historic evolution" of the APA and the "statutory structure of its rulemaking procedures").[14] Although we addressed many principles of administrative law in our recent decision in *PNW Metal Recycling*, we did not attempt to explain the underlying objectives of agency rulemaking and how those objectives are served by the APA. We take the opportunity to do so now.

A leading scholar of administrative law has described agency rulemaking as "one of the greatest inventions of modern government." Kenneth Culp Davis, *Administrative Law Treatise* § 6.15, 283 (Supp 1970). Because legislative delegation of discretionary authority to agencies can be sweeping in scope, rulemaking procedures were developed

---

[14] Before serving as Oregon's Attorney General, Frohnmayer was a member of the Oregon legislature. There, he chaired a subcommittee on APA reform and was the principal sponsor of the 1979 legislation that substantially amended the APA. *See* Frohnmayer, 58 Or L Rev at 411 (summarizing his involvement with the APA).

"to confine this discretion within broadly acceptable under-standings of the rule of law." Frohnmayer, 58 Or L Rev at 428; *see also Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984) (noting that "the proper sequence of analyzing the legality" of agency action under the APA is "designed to assure that the challenged action *** in fact was authorized by the state's *** politi-cally accountable policy makers").

Those rulemaking procedures are generally designed to (1) permit public scrutiny of agency policy; (2) assure greater public confidence in agency policy making; (3) per-mit interested parties to be heard in formulating policy; (4) permit the public to know in advance the applicable standards; (5) assure even-handed treatment; (6) provide consistency in internal treatment of cases resolved without litigation; (7) enable parties and decision makers in a con-tested case to know what facts are critical to the determina-tion; and (8) minimize inconsistent and arbitrary decisions. *See Sun Ray Dairy v. OLCC*, 16 Or App 63, 71-73, 517 P2d 289 (1973) (summarizing objectives of agency rulemaking); Frohnmayer, 58 Or L Rev at 442 (same).

Those objectives are served by notice-and-comment rulemaking. Notice-and-comment rulemaking is generally required whenever an agency action constitutes a rule as defined in ORS 183.310(9), that rule does not fall within an exception listed in ORS 183.355 to the notice-and-comment requirements, and the legislature has not other-wise exempted the agency action from notice-and-comment requirements.

Determining whether an agency action constitutes a rule turns on the APA's definition of "rule." That definition was designed to be self-executing, meaning that, if an agency action meets the definition, then the agency has enacted a rule. *See* Frohnmayer, 58 Or L Rev at 433 ("the statutory definition means what it says" and "any agency action meet-ing that definition is a 'rule' unless it falls within one of the enumerated exceptions"). In other words, unless an exception applies, an agency enacts a rule whenever it issues a "direc-tive, standard, regulation or statement of general applicabil-ity that implements or prescribes law or policy or describes

the procedure or practice requirements" of the agency. ORS 183.310(9). For that rule to be valid and legally enforceable, an agency is required to enact the rule using the APA's notice-and-comment rulemaking procedures, unless the legislature has said otherwise. *See* ORS 183.335(1) (requiring agencies to comply with the APA's notice-and-comment rulemaking procedures "[p]rior to the adoption * * * of any rule"); *Planned Parenthood*, 297 Or at 565 (noting that, if an agency action "fell within the reach" of the agency's authority, "the question is whether the action was taken by procedures prescribed by statute or regulation").

Determining when an agency action meets the definition of a "rule" is separate from determining when an agency must adopt a rule. For example, an agency must adopt a rule when the legislature has directed the agency to make rules on a certain topic and when rulemaking is required as a condition precedent to agency enforcement of broad or vague standards. *See* Frohnmayer, 58 Or L Rev at 429 (summarizing and describing when rulemaking is required).[15] The APA's definition of "rule" does not inform the question of when an agency must adopt rules. That question is instead informed by the agency's enabling statute. *See PNW Metal Recycling*, 371 Or at 685 ("Whether an agency must use rulemaking in a particular situation is a function of the agency's substantive authority as defined by its enabling statutes.").

Here, AGC does not contend that the legislature expressly required ODOT to adopt a rule establishing the terms and conditions of its community benefits contracts. Nor does AGC contend that rulemaking was required as a

---

[15] *See Trebesch v. Employment Division*, 300 Or 264, 270, 710 P2d 136 (1985) ("It is always possible for the legislature explicitly to require an agency to define any type of statutory term by rulemaking."); *Marbet v. Portland Gen. Elect.*, 277 Or 447, 458, 561 P2d 154 (1977) (noting that agency's authorizing statute "expressly directs [the agency] to set its own standards refining the statutory policies"). Two prior cases expressly addressed rulemaking in advance of enforcement or adjudication. *See Trebesch*, 300 Or at 267 (describing the issue presented as whether the agency officials "are required to promulgate rules in advance of adjudication"); *Megdal v. Board of Dental Examiners*, 288 Or 293, 320, 605 P2d 188 (1982) (holding that the board was required to engage in rulemaking defining the statutory standard of "unprofessional conduct" before revoking a dentist's license for engaging in such conduct). Neither of those circumstances is presented in this case, and no party contends that the legislature expressly required agencies to engage in rulemaking for their community benefits programs. Accordingly, we do not address those circumstances further in this opinion.

condition precedent to enforcement. Rather, AGC contends that notice-and-comment procedures were required because the CWA meets the APA's definition of a rule, and, therefore, ORS 183.335(1) expressly required ODOT to comply with the APA's notice-and-comment requirements before adopting the policies in the CWA for its community benefit program. In response, as noted above, ODOT does not contend that its adoption of the CWA is excluded by any of the exceptions to the definition of "rule" in ORS 183.310(9). Nor does ODOT contend that its adoption of the CWA fits within any of the exceptions to the notice-and-comment rulemaking procedures that are set out in ORS 183.335. Finally, ODOT does not contend that the community benefit statute, ORS 279C.308, or any other statute exempts it from complying with the APA's notice-and-comment rulemaking procedures in adopting the policies that will govern its community benefit program.

Rather, ODOT relies entirely on the definition of "rule" in ORS 183.310(9), contending that the CWA does not fit that definition. We disagree for the reasons explained above. That conclusion also meets the objectives served by the APA's notice-and-comment rulemaking procedures, procedures that confine agency discretion to ensure compliance with the rule of law. Formal rules exist to minimize inconsistent and arbitrary decision making. By ensuring that *all* interested parties are heard in formulating the policies embodied in the CWA—not just those that were involved in negotiating its terms—rulemaking allows public scrutiny of agency policymaking and opportunities for input, thereby assuring greater public confidence in the process.

That does not mean that notice-and-comment procedures are required before a contracting agency can define the terms and conditions in the "solicitation documents" for a public improvement contract. Those terms and conditions typically would not be statements of general applicability that prescribe agency policy, so they would not meet the definition of "rule" in ORS 183.310(9). Moreover, as noted above, the requirements for the solicitation and award of a public improvement contract—including the solicitation and award of a community benefit contract—are exempt from notice-and-comment rulemaking under ORS 183.335(10),

which includes, among other provisions, the statutes governing solicitation and award of public improvement contracts, ORS 279C.360 through 279C.380, in the list of exemptions.

In contrast, as discussed above, the CWA is a statement of general applicability that prescribes ODOT's policies for its community benefit program. The CWA itself is not the solicitation and award of a public improvement contract; it is the *precursor* to the solicitation and award of such a contract and applies to all current and future ODOT community benefit contracts. As such, the CWA is a statement of the policies—adopted through negotiations with labor unions but without complying with the APA's formal notice-and-comment procedures—that will govern ODOT's community benefit program.[16] Those policies describe in detail the terms and conditions that ODOT *will include* in contracts for projects it designates for that program. That makes the CWA a rule that is subject to notice-and-comment procedures.[17]

ODOT suggests that its adoption of the CWA is analogous to the agency actions at issue in *Homestyle Direct* and *PNW Metal Recycling*, which did not require rulemaking. We disagree. *Homestyle Direct* was a contested case proceeding in which the agency revoked a contractor's eligibility because the contractor failed to comply with standards set forth in its contract with the agency. The contractor contended as a defense that those standards were not enforceable as contract provisions because they were "unenforceable, unpromulgated rules[.]" 354 Or at 261. We disagreed, concluding that "the only relevant question" is whether the standards were

---

[16] To clarify, our opinion today does not preclude ODOT or other state agencies from creating a CWA to govern all community benefits contracts; it just requires them to engage in notice-and-comment rulemaking before committing to using the terms of CWA in all community benefit contracts, thereby promoting public involvement and transparency in the process. Nor does our opinion preclude ODOT or other state agencies from entering into project labor agreements (commonly referred to as "PLAs") where required by state law. *See* ORS 279A.803(1)(a) (requiring public bodies to enter into a PLA for certain projects).

[17] We need not decide whether ODOT would be required to engage in notice-and-comment rulemaking to develop a template of terms and conditions for community benefit contracts, either unilaterally or through discussions with labor unions. Deciding that issue may depend on whether and to what extent ODOT commits to using such a template for its current and future contracts. Our decision today is limited to the circumstances presented here, which involves a commitment by ODOT within the CWA itself to include the terms and conditions of the CWA in all its community benefit contracts.

enforceable as contract terms. *Id.* at 265. Thus, we explained, the validity of those standards "as rules, [was] irrelevant." *Id.*

The petitioner in *PNW Metal Recycling*, a scrap metal recycling company, challenged the Department of Environmental Quality's (DEQ) decision to reinterpret an existing statute, thereby changing longstanding agency practice. Under DEQ's original interpretation, scrap metal recyclers that also disposed of solid wastes were not required to get a solid waste disposal permit from DEQ. DEQ decided to change that interpretation and notified scrap metal recyclers that a permit would be required under the agency's new interpretation. We concluded that DEQ's "interpretive decision is not, itself, a rule, although the generally applicable expression of such a decision could be." 371 Or at 700.[18]

In this case, ODOT is not seeking to *enforce* the terms of an existing contract, as in *Homestyle Direct*. Rather, ODOT is seeking to use the CWA to *establish* the terms for all of its current and future community benefit contracts that it will award under the Public Contracting Code. Nor is AGC challenging an "interpretive decision," as in *PNW Metal Recycling*. As explained above, the CWA is a generally applicable expression of ODOT's policy regarding its community benefits program. Accordingly, it is a rule and notice-and-comment rulemaking was required.

### III.   CONCLUSION

In summary, the CWA meets the APA's definition of a rule because it is a statement of general applicability that prescribes policy. ODOT does not contend that the CWA fits within any of the enumerated exceptions to the APA's rulemaking requirement, and it acknowledges that it

---

[18] The dissenting opinion suggests that we are "disregarding" the approach taken in *Homestyle Direct* and applied in *PNW Metal Recycling*. 373 Or at 427. But as noted above, *Homestyle Direct* was not a rule challenge under ORS 183.400, and it has little relevance to a rule challenge. *See Homestyle Direct*, 354 Or at 265 ("The only relevant question is whether the [standards] are applicable to Homestyle *as contract terms*. It necessarily follows that * * * the validity of the * * * standards, as rules, is irrelevant."). And we concluded in *PNW Metal Recycling* that the agency's "interpretative decision" that was at issue in that case was not a "rule" as defined by the APA. 371 Or at 700. Our conclusion that the CWA is a rule is not inconsistent with the contrary conclusion that we reached under different circumstances in *PNW Metal Recycling*.

did not comply with the APA's rulemaking requirements.[19] Accordingly, we conclude that the CWA is invalid as an invalidly promulgated rule.

The Oregon Department of Transportation's challenged rule is declared invalid.

**MASIH, J.,** dissenting.

In this case, we must determine what authority the legislature granted contracting agencies under ORS 279C.308 of the Public Contracting Code. *See* ORS 279A.005 ("ORS chapters 279A, 279B and 279C may be cited as the Public Contracting Code."). ORS 279C.308, at a minimum, gives contracting agencies the ability to designate public improvement contracts as "community benefit contracts" and to establish the material terms of those contracts through "rulemaking" or other "administrative measures."

Oregon law gives state agencies a variety of administrative measure options to accomplish the work that they undertake on behalf of Oregonians. Each option provides its own path for challenge and review. For example, ORS chapter 183—the Oregon Administrative Procedures Act (APA)—grants agencies the discretion to issue a "declaratory ruling" about the applicability of any rule or statute enforceable by that agency to certain facts and provides for judicial review of that declaratory ruling by the Oregon Court of Appeals. ORS 183.410.

State agencies are also empowered to pursue enforcement of the rules and statutes within their delegated authority through "orders in contested cases" or "orders in other than contested cases," and any person adversely affected or aggrieved by such an order may seek judicial review of the order by the Oregon Court of Appeals or the circuit courts respectively. *See* ORS 183.310(2)(a), (6)(a) (defining contested case and order); ORS 183.482 (providing for

---

[19] The dissenting opinion describes the "commendable" process that ODOT followed to gather data and input from various stakeholders in developing the CWA, and laments that this work has "been for naught" because of today's opinion. 373 Or at 438. We do not intend to denigrate ODOT's process, but the fact remains that, however commendable that process may have been, it did not comply with the notice-and-comment rulemaking requirements of the APA, and ODOT does not contend that it did.

judicial review of contested cases); ORS 183.484 (providing for judicial review of orders in other than contested cases).

Statutes governing an agency may also either *require* or simply *authorize* the agency to adopt "rules" implementing the statutes. *Compare, e.g.*, ORS 366.112(3) (providing that Oregon Department of Transportation bicycle lane and path advisory committee "shall adopt rules to govern its proceedings"), *with* ORS 366.158(2) (requiring the Oregon Department of Transportation to administer an Adopt-a-Highway Program and providing that the department "may adopt any rules it considers necessary for implementation of the * * * Program"). An interested person may also petition an agency requesting the promulgation, amendment, or repeal of a rule. ORS 183.390. And the validity of any rule may be challenged in the Court of Appeals pursuant to ORS 183.400.[1]

Finally, agencies are authorized to enter into contracts for all varieties of procurement of goods and services, including "public improvement contracts," under the Public Contracting Code. *See* ORS 279A.010 (defining "contracting agency," "procurement," "public contract," "public improvement," and "public improvement contract"); ORS 279C.375 (providing process for award and execution of public improvement contract). A protest regarding the "procurement process" may be filed with the contracting agency in accordance with the provisions of ORS 279B.400 to 279B.425. ORS 279A.225(1). ORS 279B.400 to 279B.425, in turn, include provisions for judicial review. And ORS 279C.460 provides "[a]ny bidder or proposer adversely affected or any trade association of construction contractors acting on behalf of a member of the association to protect interests common to construction contractor members" the right to bring an action in circuit court for the purpose of "determin[ing] * * * applicability of," or seeking "compliance with, or preventing violations of, ORS 279C.300 to 279C.470" of the Public Contracting Code.[2]

---

[1] For example, under ORS 183.400, Associated General Contractors (AGC)—petitioner in this case—has challenged the validity of OAR-731-005-0900—the rule adopted by the Oregon Department of Transportation (ODOT) establishing its Community Benefit Program and authority to enter into community workforce agreements. That case is currently pending in the Court of Appeals (Case No A180612).

[2] Here, for example, in addition to its separate rule challenge pending in the Court of Appeals, AGC also filed a complaint against ODOT in the Marion

The Public Contracting Code, and any agency contracting under that code, have always been recognized as having a different proprietary function or status by the APA. As the majority notes, when the legislature amended the definition of "rule" in the APA in 1971, it also added—in the same bill—a public contracting exception to the notice-and-comment rulemaking requirements for the entire Public Contracting Code. *See* Or Laws 1971, ch 734, § 1 (defining "rule"); *id*. § 3 (adding exception for all of ORS chapter 279, which at that time was the entire Public Contracting Code).[3] That exemption was codified in ORS 183.335 and continues to this day to cover much of public contracting.

In this case, ODOT—acting in its contracting capacity to secure skilled workers during a worker shortage—entered into a Community Workforce Agreement (CWA) with labor organizations. The CWA is a type of Project Labor Agreement (PLA)[4] used by public contracting agencies

---

County Circuit Court (Case No 24CV02310) pursuant to ORS 279C.460. That case is the subject of the related mandamus petition, which the majority concludes is mooted by the decision in this case. *Oregon-Columbia Chapter AGC v. ODOT (S071037)*, 373 Or 440, ___ P3d ___ (2025).

[3] The legislature's changes to the APA in 1971 were "sweeping in their implications," including "dramatically increas[ing] the number of agency actions subject to the APA's rulemaking requirements" and extending "the rulemaking requirements to several agencies formerly exempted." David B. Frohnmayer, *Oregon Administrative Procedure Act: An Essay on State Administrative Rulemaking Procedure Reform*, 58 Or L Rev 411, 419 (1980). Thus, in the same legislation broadening the definition of "rule" to promote public participation, the legislature expressly exempted the public contracting bid specification process from those newly expanded rulemaking requirements. *See* Memorandum on Attorney General Proposed Amendments, House Committee on Judiciary, HB 1213, Mar 19, 1971, 2 (explaining that proposed amendment exempts specification for bid process from the rulemaking requirements of the Administrative Procedures Act).

[4] In *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass/R. I., Inc*., 507 US 218, 232-33, 113 S Ct 1190, 122 L Ed 2d 565 (1993) (*Boston Harbor*), the United States Supreme Court held that the National Labor Relations Act (NLRA) does not preempt a state authority, acting as the owner of a construction project, from mandating an otherwise lawful project labor agreement as a bid specification for the project. Citing 29 USC section 158(e)—the well-established exception in the NLRA for pre-hire collective bargaining in the construction industry—the Court explained:

"To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation

"for large and complex construction projects." *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.*, 21 Cal 4th 352, 359, 981 P2d 499, 502 (1999). Such agreements are "designed to eliminate potential delays resulting from labor strife, to ensure a steady supply of skilled labor on the project, and to provide a contractually binding means of resolving worker grievances." *Id.* The agreement is negotiated with labor organizations who might supply the various skilled workers needed for the project before the competitive bid process so that contractors wanting to bid on the project can estimate their labor costs for purposes of their competitive bid. *Id.* at 360, 981 P2d at 503.

    In this instance, the CWA contains terms and conditions ODOT agreed to include in the bid specifications for eight public improvement projects designated by ODOT as a "community benefit project" under ORS 279C.308 and OAR 731-005-0900, ODOT's rule implementing ORS 279C.308. Article 1, section 9, of the CWA provides that it "takes effect with regard to a [c]overed [p]roject only if application of th[e] [a]greement is permitted by the project's funding sources, including but not limited to any required authorizations, approvals, or permissions by the Federal Highway Administration ('FHWA') or the State of Oregon." And, according to Article 21, section 2, its terms can be amended regarding application to covered work "by mutual agreement of ODOT, the ODOT Contractor, the affected Unions, and the affected Subcontractors." ODOT maintains that it was "exercising its executive power to develop terms for a contract" when it negotiated the CWA consistent with the rule, the statute, and the requirements for federal highway projects.

    The issue in this case is whether ODOT was *required* to follow the notice-and-comment rulemaking procedures of the APA, ORS 183.335, to develop the terms of the CWA as a bid specification for the eight projects designated by ODOT

---

to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction."

*Id*. at 231-32 (emphasis in original).

as subject to a "community benefit contract" under ORS 279C.308. The majority concludes that ODOT was required to comply with those rulemaking procedures, but it reaches that conclusion by disregarding the approach we reiterated in *Homestyle Direct, LLC v. DHS*, 354 Or 253, 265-66, 311 P3d 487 (2013), and applied as recently as in *PNW Metal Recycling, Inc. v. DEQ*, 371 Or 673, 540 P3d 523 (2023), *adh'd to as modified on recons*, 372 Or 158, 546 P3d 286 (2024). Those cases make clear that whether, in a particular situation, an agency must act through rulemaking is a determination that involves an analysis of the specific statutory scheme under which an agency is operating. Following that approach, and based on my review of the text, context, and legislative history of ORS 279C.308, I cannot find any such requirement.

As I explain further below, the text of the statute is written in permissive terms and does not provide that rulemaking is the sole means by which a contracting agency like ODOT can act. I also find it compelling that the entire bid solicitation and award process for public improvement contracts has historically been, and continues to be, expressly exempted from APA rulemaking requirements pursuant to ORS 183.335(10). And finally, the legislative history for ORS 279C.308 indicates that the legislature was intending to grant contracting agencies the authority to set the terms of these "community benefit contracts" based on the needs of the specific public improvement project. In this case, the eight projects are ones which are partially or fully funded by the federal government and are being pursued in conjunction with the FHWA within tight timelines.

## I.  ANALYSIS

As explained above, whether, in a particular situation, an agency must act through rulemaking requires an analysis of the specific statutory scheme under which an agency operates. *See Homestyle Direct*, 354 Or at 265 (citing *Forelaws on Board v. Energy Fac. Siting Council*¸ 306 Or 205, 214, 760 P2d 212 (1988)). Accordingly, I start with an analysis of the text, context, and legislative history of the operative statute, ORS 279C.308, under *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

A.   *Text and Context of ORS 279C.308*

As the majority notes, ORS 279C.308 was proposed as Senate Bill (SB) 420 (2021). *See* Or Laws 2021, ch 488. The legislature enacted that statute, along with other conforming amendments, to the Public Contracting Code. The text of ORS 279C.308 provides, in its entirety:

"(1)   As used in this section:

"(a)   Apprentice' has the meaning given that term in ORS 660.010.

"(b)   'Apprenticeable occupation' has the meaning given that term in ORS 660.010.

"(c)   'Community benefit project' means *a public improvement project* that is subject to the terms and conditions of a community benefit contract.

"(2)   As used in this section and in ORS 279C.375 and 279C.430, 'community benefit contract' means a public improvement contract that includes, but is not limited to, the elements described in subsection (3)(b) of this section.

"(3)(a)   A contracting agency or local contract review board *may enact or adopt, as appropriate, an ordinance, resolution, rule, regulation or other legislative or administrative measure* that authorizes the contracting agency or local contract review board to designate a public improvement contract as a community benefit contract.

"(b)   *In addition to* and not in lieu of any other requirement that applies to a public improvement contract under this chapter, a public improvement contract that a contracting agency or local contract review board designates as a community benefit contract *may include as material provisions of the contract, but need not be limited to, terms and conditions that require the contractor to*:

"(A)   Qualify as a training agent, as defined in ORS 660.010, or provide apprenticeship training that meets applicable federal and state standards for apprenticeship training;

"(B)   Employ apprentices to perform a specified percentage of work hours that workers in apprenticeable occupations perform on the community benefit project;

"(C)   Provide employer-paid family health insurance; and

"(D)   *Meet any other requirements that the contracting agency or local contract review board sets forth in the ordinance, resolution, rule, regulation or other legislative or administrative measure that authorizes procurements of community benefit contracts.*

"(c)   A contracting agency or local contract review board shall:

"(A)   *Ensure, before advertising or soliciting a community benefit contract, that all advertisements and solicitation documents state clearly that the procurement is for a community benefit contract and identify conspicuously all of the provisions to which a contractor will be subject*, including the percentage of work hours for which the contractor must employ apprentices and the standards that will apply to the health plan the contractor must provide; and

"(B)   *Require, before accepting and evaluating bids or proposals for a community benefit contract, that each bidder or proposer include with the bid or proposal a signed statement that acknowledges that the bidder or proposer understands and agrees to be bound by the requirements that apply to the community benefit contract.*

"(4)   Except as otherwise provided in this section, a *solicitation and award* of a community benefit contract is subject to all applicable provisions of the Public Contracting Code."

(Emphases added.)

The statute's scope is limited to "public improvement contracts" and within that scope, is directed to the subset of public improvement contracts that are designated by an agency as a "community benefit contract." The designation is not mandatory, and how the agency can pursue that designation is also not limited *solely* to rulemaking. Rather, under paragraph (3)(a), the agency "*may* enact or adopt, *as appropriate*, an ordinance, resolution, rule, regulation or other legislative or administrative measure." (Emphases added.) And although subparagraphs (3)(b)(A) to (C) of the statute provide three potential terms and conditions a contracting agency "may include" as material provisions in a community

benefit contract, in addition to "any other requirements that the contracting agency or local contract review board sets forth in the ordinance, resolution, rule, regulation or other legislative or administrative measure that authorizes pro- curements of community benefit contracts" under subpara- graph (3)(b)(D), the introductory clause to those subsections makes clear that the community benefit contract "need not be limited to" those terms and conditions.

However an agency generates those terms and con- ditions—whether by rulemaking or other administrative measure such as a contract—the legislature has mandated that the contracting agency (1) before it advertises or solicits bids for a community benefit contract, "state clearly that the procurement is for a community benefit contract and iden- tify conspicuously all of the provisions to which a contrac- tor will be subject," ORS 279C.308(3)(c)(A), and (2) before it accepts and evaluates bids or proposals for a community benefit contract, "[r]equire *** that each bidder or proposer include with the bid or proposal a signed statement that acknowledges that the bidder or proposer understands and agrees to be bound by the requirements that apply to the community benefit contract," ORS 279C.308(3)(c)(B).

To ensure that the latter requirement is followed, in the same 2021 bill, the legislature amended ORS 279C.375 (3)(b), adding a new subparagraph to the list of factors that an agency must consider in determining whether a bidder is a "responsible bidder" for purposes of selecting the "low- est responsible bidder" entitled to be awarded the contract. *See* Or Laws 2021, ch 488, § 3; ORS 279A.010(1)(r) (defining "lowest responsible bidder"). That new subparagraph—ORS 279C.375(3)(b)(J)—requires a responsible bidder to agree "to be bound by the terms and conditions of a community benefit contract, if the public improvement contract is a community benefit contract." And, in ORS 279C.375(3)(c), the legislature also amended the "Responsibility Determination Form" checklist to expressly reference the contractor's agreement to be bound to a community benefit contract.

Finally, subsection (4) of ORS 279C.308 provides that, "[e]xcept as otherwise provided in this section, a *solici- tation and award* of a community benefit contract is subject

to all *applicable provisions* of the Public Contracting Code." (Emphases added.) The applicable provisions of the Public Contracting Code relating to "solicitation and award" of public improvement contracts are found in ORS 279C.360 to 279C.395. Every single one of those statutes, except ORS 279C.390 (exemptions of contracts from bid security and bonds) and ORS 279C.395 (rejection of bids), are expressly exempt from APA notice-and-comment rulemaking requirements under ORS 183.335(10).

Other relevant provisions of the Public Contracting Code are also expressly exempt from the APA notice-and-comment rulemaking requirements under ORS 183.335(10), including: ORS 279A.140 (state procurement of goods and services), ORS 279A.157 (use of state contracting template), and ORS 279B.200 to 279B.240 (general provisions for specifications).[5] Despite this context, the majority finds it significant that ORS 279C.308 is not listed in the ORS 183.335(10) exemptions. So, I turn next to the APA.

B.   *The APA*

In support of its conclusion that APA rulemaking notice-and-comment procedures were required for the CWA, the majority relies primarily on the definition of "rule" in ORS 183.310(9)[6] and application of that definition by this court in *Fremont Lumber Co. v. Energy Facility Siting Council*, 331 Or 566, 16 P3d 1147 (2001). In that case, the petitioners challenged amendments to two rules of the Energy Facility Siting Council (EFSC), OAR 345-050-0010

---

[5] Technically, ORS chapter 279B is not applicable to "contracting involving public improvements," *see* ORS 279A.020(2), but no similar provision exists in ORS chapters 279A or 279C. And ORS 279B.210 demonstrates the freedom that contracting agencies have to consult, and even contract with, "representatives of the industries with which the contracting agencies contract" to develop specifications for contracts. *See id.* (so stating as a means "to encourage the development of clear, precise and accurate specifications in solicitations for public contracts"). The process is not unlike that followed by ODOT here. And as noted above, ORS 279C.375, the statute governing specifications for public improvement contracts, is also exempt under ORS 183.335(10), as is ORS 279A.159, relating to agency personnel designated to develop specifications and develop or adapt solicitation documents for a procurement.

[6] ORS 183.310(9) defines a "rule" to mean, with certain limited exceptions, "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practice requirements of any agency."

and OAR 345-050-0060, as exceeding EFSC's statutory authority. After reviewing relevant provisions of ORS chapter 469, governing EFSC authority, and concluding that the agency was given "broad rulemaking authority" to support the amendments to the administrative rules in question, this court turned to petitioners' alternative argument that, nevertheless, the amendments should not apply to them because OAR 345-050-0060 was not a valid rule within the meaning of the APA definition of "rule." *Id.* at 572-73. Specifically, the petitioners argued that, because the challenged rule applied to "a cooperative agreement or arrangement" with federal agencies, presumably one agreement at a time, it was not a rule of "general applicability." *Id.* at 573. This court rejected that argument, finding that "the rule applie[d] to *any* such agreement or arrangement" and thus, was one of general applicability within the definition of a "rule." *Id.* (emphasis in original). That conclusion differs from our more recent ruling in *Stop B2H Coalition v. Dept. of Energy*, 370 Or 792, 810, 525 P3d 864 (2023), in which we explained that the Oregon Department of Energy's "modification of the one-mile requirement applied only to the site certificate for this specific proposed transmission line" and therefore, was not a rule of general applicability. *Id.* at 810.

Ultimately, however, this court's decision in *Fremont* upheld the challenged rules as a valid exercise of EFSC's authority based on a review of the agency's governing statutes and not the APA. 331 Or at 574. This court's decision did not include a review of the specific terms of any agreement. And most importantly for purposes of this case, the agreements referenced in the rule at issue in *Fremont* did not involve an agency acting in its "public contracting" capacity within the meaning of the Public Contracting Code. *See* ORS 279A.025(2)(a)(F) (providing that the Public Contracting Code does not apply to contracts between a contracting agency and the federal government).

Although ORS chapter 279, governing public contracting at the time, was amended in 1975 to require the Attorney General to adopt "model rules of procedure appropriate for use by all public contracting agencies governing bid procedures, advertisements, the awarding of bids, retainage,

claims, liens, bid security, payment and performance bonds and other matters involving public contracts," Or Laws 1975, ch 771, § 26, and amended again in 1999 to authorize contracting agencies to adopt their own rules of procedure, Or Laws 1999, ch 29, § 1, ORS 183.335 of the APA continued to contain exemptions for the vast majority of the Public Contracting Code, *see* ORS 183.335(8) (1975) (exempting bid process and all general public contracting provisions); ORS 183.335(9) (1999) (exempting same). Even after major revisions to ORS chapter 279 in 2003, which divided the chapter into the three separate chapters of 279A, 279B, and 279C, the legislature maintained those exemptions, intending for the existing contracting exemptions to remain as broad as they were prior to the 2003 changes. *See* Exhibit F, House Work Group on Public Contracting Law, HB 2341, Jan 31, 2003 (statement of AGC representative, Jessica Harris, summarizing bill and explaining that work group did not intend to make substantive changes to those previously exempted sections). As noted, ORS 183.335(10) continues to exempt significant sections of the Public Contracting Code from the APA rulemaking requirements, including as relevant here, those relating to "solicitation and award" of public improvement contracts found in ORS 279C.360 to 279C.380.[7]

Thus, I would continue to apply the approach we established in *Homestyle Direct*, which did involve an exercise of an agency's public contracting authority and also recognized the broad nature of the exemptions for public contracting included in ORS 183.335(10). In *Homestyle Direct*, the Department of Human Services (DHS) had revoked a contractor's eligibility to provide home delivered meals to Medicaid clients because the contractor breached certain food preparation and delivery standards that the agency had incorporated into a contract for all such contractors. The Court of Appeals had concluded that

---

[7] ORS 183.335(10) provides, in its entirety:

"This section does not apply to ORS 279.835 to 279.855, 279A.140 to 279A.161, 279A.250 to 279A.290, 279A.990, 279B.050 to 279B.085, 279B.200 to 279B.240, 279B.270, 279B.275, 279B.280, 279C.360, 279C.365, 279C.370, 279C.375, 279C.380, 279C.385, 279C.500 to 279C.530, 279C.540, 279C.545, 279C.550 to 279C.570, 279C.580, 279C.585, 279C.590, 279C.600 to 279C.625, 279C.650 to 279C.670 and 279C.800 to 279C.870 relating to public contracts and purchasing."

> "the HDM standards amounted to unenforceable, unpromulgated administrative rules. DHS \*\*\* 'cannot enforce its own unpromulgated standards by putting them in the provider agreement and then enforcing the rule that allows sanctions for noncompliance with that agreement. In substance, if not in form, that is an attempt to enforce an invalid rule.'"

354 Or at 259 (citation omitted). This court rejected the Court of Appeals' reasoning, noting from the outset that, the Court of Appeals' rationale proceeded from the "mistaken premise" that, "before any rule can go into effect, it must be subject to public scrutiny." *Id.* at 265. This court then explained that just because an administrative standard meets the APA definition of "rule" does not mean that it is invalid unless it is preceded by the notice-and-comment rulemaking process. *Id.* at 265-66. Citing the exemptions for "public contracting" in ORS 183.335(10) and "contested case proceedings" in ORS 183.355(5) as examples within the APA itself of authority for an agency to develop standards without first going through the notice-and-comment rulemaking process, this court explained that, ultimately,

> "[w]hether an agency is required to adopt a policy that qualifies as a 'rule' *solely* by means of rulemaking procedures depends on whether the legislature has declared that rulemaking is the sole acceptable means of adopting the particular policy at issue. *See, e.g., Forelaws on Board v. Energy Fac. Siting Council*, 306 Or [at 214] ('If an agency is required to adopt a rule through rulemaking proceedings, that requirement must be found through analysis of the specific statutory scheme under which an agency operates and the nature of the rule that the agency wishes to adopt.')."

*Id.* (emphasis in original). This court proceeded to enforce the standards incorporated into the contract.

I would do the same here. Applying *Homestyle Direct*, I would conclude that it does not matter if the CWA does or does not meet the definition of rule,[8] the key

---

[8] However, I do agree with ODOT that the CWA has no legal effect until it is authorized by the FHWA, and the state has incorporated it into an actual community benefit contract. And the CWA can also be amended with the mutual agreement of the parties impacted to adapt to the needs of a specific project, which means that the extent of the CWA applicable to any given project may vary. Thus, based on its limited scope of application to a unique and limited subset of

is whether rulemaking is *mandatory* and the *sole* method available to the agency to adopt standards for community benefit contracts. And, for all the reasons discussed above, I do not think that is the case based on the text of ORS 279C.308 and the related public improvement solicitation and award statutes, which are expressly exempt under ORS 183.335(10). I find additional support for that conclusion in the legislative history for ORS 279C.308.

C.    *Legislative History of ORS 279C.308*

SB 420 was sponsored by Senator Manning, at the request of Joe Berney, Chair of the Lane County Board of Commissioners. Video Recording, Senate Committee on Labor and Business, SB 420, Mar 16, 2021, at 01:02:14 (testimony of Sen Manning), https://olis.oregonlegislature.gov (accessed Apr 2, 2025). The majority correctly notes that, as originally proposed, SB 420 applied only to *local* community benefits contracts and made the statutory contract terms mandatory. SB 420 § 2(3)(a). And the bill also amended ORS 279C.375 (discussed above) and ORS 279C.430 relating to bidder prequalification.

The bill was sought by local contracting agencies and supported by labor organizations because local jurisdictions, like Lane County, had been experimenting with community benefit contracts on a project-by-project basis but wanted express legal authority for such contracts to be added to the Public Contracting Code. *See* Video Recording, Senate Committee on Labor and Business, SB 420, Mar 16, 2021, at 01:05:15 (testimony of Joe Berney, Chair, Lane County Board of Commissioners); *id.* at 01:43:04 (testimony of Chris Carpenter, Sheet Metal and Air Conditioning Contractors' National Association Oregon and SW Washington) ("I think it's just *** building off of the legwork and the framework that's already been done over the past few years in Lane County to great success and help them provide clarity for these potential local governments and contracting agencies to move forward, should they so choose, the allowance

---

public improvement contracts, the CWA does not meet the "general applicability" standard of the definition of "rule" in the APA as we applied it in *Stop B2H Coalition*, 370 Or at 810, discussed above. Rather, it is a contract or other administrative measure authorized by ORS 279C.308.

of them to spell out any other terms and conditions \*\*\*.").
Kirsten Adams testified against the bill on behalf of peti-
tioner AGC, explaining that she had been part of the 2003
changes to the Public Contracting Code and that, "while
Senate Bill 420 does not propose the same sweeping reforms
that characterized the 2003 legislation, it would for the first
time codify a little known or understood community ben-
efit contract process." *Id.* at 01:23:45 (testimony of Kirsten
Adams, AGC). Lorne Bulling, of the Ironworkers Local 29
and Operating Engineers Local 701, explained the need for
the bill as follows:

> "[T]here is currently no statute that explicitly bans local
> jurisdictions from entering into a project labor agreement
> or community benefit that we are aware of. However, some
> bad actors have continually spread false information that
> jurisdictions could face serious legal action if they enter
> into a CBA or a PLA. \*\*\* SB 420 will make it explicitly
> clear in statute that local jurisdictions have the ability to
> enter into a PLA or CBA voluntarily, and this will help to
> establish a baseline for those agreements with the option
> to increase the requirements based on those local commu-
> nities' unique needs."

Video Recording, Senate Committee on Labor and Business,
SB 420, Apr 1, 2021, at 11:02, https://olis.oregonlegislature.
gov (accessed Apr 2, 2025).

Senators Manning and Hansell worked with repre-
sentatives from all affected groups to draft amendments to
the bill that would be acceptable to all. *See* Video Recording,
Senate Committee on Labor and Business, SB 420, Apr 13,
2021, at 01:01:46 (explanation provided by Sen Hansell),
https://olis.oregonlegislature.gov (accessed Apr 2, 2025).
Although the timing was such that the Senate could not
adopt all the negotiated amendments, Senator Manning
explained on the Senate floor that he had agreed to per-
sonally deliver the amendments comprising the agreement
to the House. He provided his colleagues with the specific
amendments negotiated by the work group to page 1 of the
bill at lines 13, 21, and 22, noting:

> "[O]n page one line 13 after 'include' it will be adding 'but
> not limited to.' \*\*\* [A]lso \*\*\* on the first page line 21
> delete 'must' and replace with the word 'may.' This was a

> big concern about some of the opponents, and opponents are well really not that many opponents, but it was the language itself [it was] really important that we get it right. The last line 22 after 'include' add 'but not limited to.' These were some points [of] clarification that we needed we also did some work on identifying some issues around the medical portion * * *."

Video Recording, Senate Floor, Apr 29, 2021, at 2:31:37 (statement of Sen Manning) (SB 420 discussion starting at 2:17:49), https://olis.oregonlegislature.gov (accessed Apr 2, 2025). The end result of the negotiated changes was that opponents of the bill (the contractors) succeeded in making the mandatory provisions of subsection (3) permissive, and proponents of the bill (local contracting jurisdictions and labor organizations) obtained greater freedom to negotiate the terms and conditions.

Representative Bonham, the Vice Chair of the House Committee on Business and Labor, expressed concern about the expansive scope of the bill to Senator Manning when the senator introduced the bill to the committee at its first public hearing. Video Recording, House Committee on Business and Labor, SB 420, May 17, 2021, at 14:05 (testimony of Rep Bonham), https://olis.oregonlegislature.gov (accessed Apr 2, 2025). Senator Manning responded that the language "is designed for flexibility in negotiation of contract[.]" *Id.* at 15:56 (testimony of Sen Manning). At that same public hearing, AGC representative Kirsten Adams reported to the committee that the parties had achieved an agreement and that, "with the * * * amendments [negotiated in the Senate], AGC is neutral on the bill, and we'd really like to thank Senator Manning, Senator Hansell, and the bill proponents for working together to come to a more flexible resolution." *Id.* at 33:10.

Eventually, the bill was amended to grant that same broad "flexibility in negotiation of contract" to state contracting agencies. The bill was amended at the request of Representative Holvey, because, in his words, "I just want to make sure the state has that flexibility as well." *Id.* at 23:15 (testimony of Rep Holvey). And from my perspective, the negotiation of the CWA by ODOT falls within that "flexibility to contract." It is consistent with legislative intent and the text and context of ORS 279C.308.

## II.  CONCLUSION

Given the time constraints under which ODOT was operating after the enactment of ORS 279C.308 to pursue completion of this unique community benefit pilot project grouping of eight projects, I find it commendable that the agency (1) created a CWA Advisory Committee made up of 20 and then 65 members of interested and impacted stakeholders, including the Executive Director and two other members of AGC; (2) held 11 meetings and engaged in other forms of polling and communication with the Advisory Committee to gather data on the key elements it should include in a CWA; (3) negotiated the CWA with the labor organizations; (4) created a Rules Advisory Committee, which, again, included representation by AGC; (5) presented the CWA to both the CWA Advisory Committee and the Rules Advisory Committee; (6) held two meetings of the Rules Advisory Committee to discuss the proposed administrative rule and one public hearing after notice of the proposed rule; (7) presented the CWA and other bid specifications to the FHWA; (8) adopted the final OAR 731-005-0900; (9) finalized the CWA to comply with final input from the FHWA; and (10) began advertising for the first of the community benefit contracts. Despite all this input and work undertaken by all the different stakeholders, labor organizations, and ODOT to develop both the CWA and the community benefit contract rule and pilot program, the majority finds that the ODOT process for the current version of the CWA required *more* opportunity for notice and comment.[9] I find that the purpose underlying the notice-and-comment procedures and the legislative intent to grant agencies flexibility to contract for community benefit projects were both satisfied in this case.[10]

----

[9] It is important to note that, the majority finding only requires that ODOT go through the notice-and-comment process for the current version of the CWA. It does not preclude ODOT from entering into individual, project-specific CWAs and public improvement contracts containing such terms.

[10] To that end, I encourage the legislature to amend ORS 279C.308 and ORS 183.335(10), expressly clarifying that contractual provisions, specifications, and procurement descriptions for community benefit contracts are not rules and are not subject to the Oregon Administrative Procedure Act. *See, e.g.*, 30 Illinois Compiled Statutes 500 / 5-25(a) (Illinois Procurement Code expressly stating "[c]ontractual provisions, specifications, and procurement descriptions are not rules and are not subject to the Illinois Administrative Procedure Act.").

Therefore, I respectfully dissent.

Flynn, C.J., and James, J., join in this dissenting opinion.